BERNARD PEYTON,
Complainant,

*vs.*

WILLIAM C. PEYTON CORPORATION, a corporation organized and existing under the laws of the State of Delaware, ANNE DUPONT PEYTON, PEYTON-DUPONT, INC., a corporation organized and existing under the laws of the State of Delaware, HENRY H. WEHRANE, CLIFTON V. EDWARDS, NEVIL FORD, E. ARCHER TURNER and ROBBERT E. COULSON, Executors and Trustees under the Will of William C. Peyton,
Defendants.

WILLIAM C. PEYTON CORPORATION, a corporation organized and existing under the laws of the State of Delaware, and HENRY H. WEHRHANE, CLIFTON V. EDWARDS, NEVIL FORD, E. ARCHER TURNER and ROBERT E. COULSON, Executors and Trustees under the Will of William C. Peyton, deceased,
Cross Complainants,

*vs.*

BERNARD PEYTON and PEYTON-DUPONT, INC., a corporation existing under the laws of the State of Delaware,
Cross Defendants.

188

BERNARD PEYTON, Trustee under Declaration of Trust
dated August 21, 1936,
Complainant,

*vs.*

WILLIAM C. PEYTON CORPORATION, a corporation organized
and existing under the laws of the State of Delaware,
ANNE DUPONT PEYTON, PEYTON-DUPONT SECURITIES
COMPANY, a corporation organized and existing under
the laws of the State of Delaware, HENRY H. WEHR-
HANE, CLIFTON V. EDWARDS, NEVIL FORD, E. ARCHER
TURNER and ROBERT E. COULSON, Executors and Trus-
tees under the Will of William C. Peyton,
Defendants.

WILLIAM C. PEYTON CORPORATION, a corporation organized
and existing under the laws of the State of Delaware,
HENRY H. WEHRHANE, CLIFTON V. EDWARDS, NEVIL
FORD, E. ARCHER TURNER and ROBERT E. COULSON,
Executors and Trustees under the Will of William C.
Peyton, deceased, and THE STANDARD STOKER COM-
PANY, INC., a corporation of the State of Delaware
(formerly Peyton-duPont Securities Company),
Cross Complainants,

*vs.*

BERNARD PEYTON, Trustee under Declaration of Trust
dated August 21, 1936,
Cross Defendant.

*New Castle, August 4, 1937.*

*Hugh M. Morris* and *Edwin D. Steel, Jr.,* for complainant, cross-defendant.

*J. Rankin Davis,* for defendant Anne duPont Peyton.

*Christopher L. Ward, Jr.,* of the firm of Marvel, Morford, Ward & Logan, for Peyton-duPont, Inc.

*Clarence A. Southerland,* of the firm of Ward & Gray, for remaining defendants and cross-complainants.

THE CHANCELLOR: These cases arise out of the same circumstances of fact. The starting point for the fact sequences consists of the existence of a corporation known as The Standard Stoker Company which William C. Peyton, the father of the complainant, had organized in his lifetime to carry on a business that became under the guidance of himself and his associates eminently successful and, I gather, highly profitable, and concerning the future of

which after his death he was, as is quite evident from his will, very much concerned.

Control of the Stoker Company was vested in Peyton-duPont Securities Company through a one-hundred per cent stock ownership. The Securities Company had an issue of 293,832 shares of stock outstanding. Of these, Mr. Peyton owned 12,363, Mrs. Peyton 16,523, and another company called Peyton-duPont, Inc., 145,161 shares. These three holdings constituted a majority of the outstanding stock of the Securities Company, and so long as they acted in harmony controlled, through the Securities Company, the management of the Stoker Company. The Peyton-duPont Company has 47,600 shares outstanding, of which 20,000 shares were owned by Mr. Peyton at the time of his death and 13,868 shares were owned by Mrs. Peyton.

Thus Mr. and Mrs. Peyton through their holdings of stock in Peyton-duPont, Inc., and in the Securities Company, absolutely controlled the Stoker Company.

It was evidently the desire of Mr. Peyton to make some kind of arrangement with respect to the control and management of the Stoker Company after his death, whereby the associates who had helped him build it to its success should be assured of continuing after his death in the position of managing its business and of shaping its policies. If, after his demise, his widow should alienate the shares which she held in the two other companies above referred to, it was of course manifest to him that persons opposed to his old associates might dismiss them from any further participation in the management of the business which he and they had developed. Apparently also, from the provisions of his will, he was desirous of going so far in his appreciation of his old associates as to make it possible for them, if they cared to do so, to become the owners of all the interest in the Stoker Company which, through the shares he owned in the other two companies, was his. But he de-

sired that his widow, so long as she lived, should receive the earnings from the Stoker Company which would flow to his estate, and at the same time he entertained the view and belief that the members of his immediate family were so circumstanced that they were in no need of financial assistance from his estate.

After consultation with his wife, he devised a testamentary scheme which, if his wife approved and co-operated therewith, would accomplish his purpose of making certain the continuance of his associates in the control of the Stoker Company's business, and at the same time would leave undisturbed his wife's relative position as an owner therein; a scheme that would give her the income from the Stoker Company business which his estate would receive and after the death of his wife would place the ultimate destination of his Stoker Company holdings (indirectly held) in the uncontrolled discretion of the trustees he would name, who were the associates before referred to.

The scheme devised consisted of a will of his own supplemented by an agreement to be entered into by his wife. Accordingly he caused the draft of a will to be prepared to which was appended an agreement to be signed by his wife.

The draft and agreement were carried to Mrs. Peyton in her home by Mr. Chambers, an associate of Col. Coulson who was Mr. Peyton's attorney. Mrs. Peyton examined the papers for about twenty-minutes, stated in response to a question to that effect from Mr. Chambers that she understood them and that they conformed to what her husband had already explained to her. Thereupon, on October 26, 1934, Mrs. Peyton duly signed and sealed the agreement, and three days thereafter, Mr. Peyton duly executed the will to which the agreement was attached.

The will, in the parts thereof pertinent to this controversy, and the agreement of Mrs. Peyton are as follows:

"First: I direct payment of my debts, funeral expenses and expenses of administration, and also payment from my residuary estate of all transfer and inheritance taxes upon the legacies and devises herein.

"Second: I give and bequeath to my wife, Anne duPont Peyton, all my personal effects of whatsoever kind and wheresoever located, including all furniture, household effects, utensils and supplies, glass, china, plate, plated ware and other household furnishings, watches, jewelry, clothing, books and any other works of art or ornament, automobiles, and garage equipment and supplies.

"Third: All the residue of my estate of every kind I give, devise and bequeath to my Trustees, hereinafter appointed, in trust, during the life of my wife, Anne duPont Peyton, to be held, invested and reinvested by my said Trustees, and they shall receive the income thereof, and shall pay over said net income to my wife, Anne duPont Peyton, or upon her order, during her life, payments to be made annually, semi-annually or quarterly, as said Trustees may determine.

"Upon the death of my said wife, Anne duPont Peyton, my said Trustees shall transfer and pay over the entire principal of said trust to themselves, as individuals, to have and to hold unto them as joint tenants and not severally nor as tenants in common, with the right of survivorship expressly vested in said joint tenants. Acceptance by said Trustees, as individuals, of the remainder after the trust herein provided, shall be deemed an agreement among them to hold such remainder without severance of the joint tenancy to the end that it may be administered as a unit by them and their survivors only.

"Fourth: It is my intention to prepare and cause to be delivered after my death, to my wife, Anne duPont, a letter which shall outline in such detail as may be feasible, certain dispositions of the income of the said trust property during the life of my said wife, which I recommend to my said wife, as dispositions of said income which would meet with my approval, under the circumstances existing at the time said letter is written. It is not my intention, however, that the absolute freedom of disposition by my said wife of the income accruing to her under the trust herein created, shall be in any wise limited or restrained by the terms of said letter. It is likewise my intention to prepare and cause to be delivered to my said Trustees a letter which shall outline in such detail as may be feasible, certain dispositions of the principal and income of said property after the death of my wife, when my said Trustees take said property in their own right as joint tenants, as dispositions of income and

principal which would meet with my approval, under the circumstances existing at the time said letter is written. Again, however, it is not my intention that the absolute estate and ownership and freedom of disposition by said joint tenants of the principal or income pf said property shall be in any wise legally limited or restrained by the terms of said letter. I have complete confidence that my said wife and the individuals hereinafter named as Trustees, will desire to make such disposition of said income and principal as I myself might desire to make, if I were still living, under the circumstances from time to time existing, and I have confidence in their discretion in modifying or abandoning any suggestions I may have made, if circumstances have so changed as to render my suggestions unwise or impracticable, and I therefore have no desire to limit or restrain in any manner their absolute ownership and power of disposition.

"Fifth: In order that the reasons for the disposition of my estate herein made, may be clearly understood, it is desirable that I indicate in this my Last Will and Testament the considerations entering into the disposition of my estate herein provided. A large part of my personal estate consists of my interest in The Standard Stoker Company, Inc., a Delaware corporation, an enterprise to the development of which I have devoted much of my time for some years past. My interest in The Standard Stoker Company, Inc., is represented by ownership of stock in Peyton-duPont Securities Company, a Delaware corporation which owns all the stock of The Standard Stoker Company, Inc., and of stock in Peyton-duPont, Inc., a Delaware corporation which has voting control of Peyton-duPont Securities Company. The members of my immediate family neither need nor desire financial provision for them in the disposition of my estate. It is therefore my wish to so dispose of my interests as to leave the control and direction of The Standard Stoker Company, Inc., in the hands of those who have been associated with me in its development, and, at the same time, to evidence to those with whom I have been so associated my confidence in them and my appreciation of their cooperation with me in the development of the enterprise.

"It is my wish and express direction that my said Executors immediately upon my death cause to be organized a corporation under the laws of the State of Delaware, or such other State as they may determine, to be known as the 'William C. Peyton Corporation' or by such other appropriate title as they may select, in which corporation they shall be designated as directors, and to which corporation there shall be transferred all of the stock in Peyton-duPont Securities Com-

pany and Peyton-duPont, Inc., owned by me at the time of my death; the stock of this new corporation to replace the stock of Peyton-duPont Securities Company and Peyton-duPont, Inc., in my estate and to become a part of the trust fund hereinabove constituted.

"It is further my desire that my said Executors and Trustees, in exercising their control of The Standard Stoker Company, Inc. should endeavor to cause that Company and said controlling corporations, to distribute currently by way of dividends on their stock, all of the earnings of the stoker enterprise, over and above such amounts as may be retained in the exercise of reasonable business caution as necessary working surplus.

"In order that complete working control of The Standard Stoker Company, Inc. shall be secured to my said Executors and Trustees, and the plan hereinabove set forth made effective, my said wife, Anne duPont Peyton, has agreed, by a writing filed with this my Will, upon the assurance of which this Will is executed, to transfer to said new corporation, to be organized as above provided, as soon as may be after my death, any and all stock which she may then hold in Peyton-duPont Securities Company and Peyton-duPont, Inc., and accept in exchange therefor stock in said new corporation, entitling her to a pro rata interest in the earnings and assets of said new corporation, but without voting power, in order that the effective control and direction of The Standard Stoker Company, Inc. may be vested in the persons hereinafter named by me as Executors and Trustees, in their capacity as directors of the corporation so to be formed by them.

"Nothing herein contained is intended or should be construed to limit the discretion of my said Executors or Trustees in the event they shall deem it wise to dispose of all or any of the stock in Peyton-duPont, Inc. and/or Peyton-duPont Securities Company and/or of the stock of the proposed new corporation to be organized pursuant to the provisions of this Paragraph Fifth of this my Last Will and Testament, prior to the termination of the trusts herein constituted."

### AGREEMENT.

"October 26th, 1934.

"The undersigned, Anne duPont Peyton, hereby consents to the execution of the annexed Will of her husband, William C. Peyton, and approves of the disposition of his estate therein provided, and hereby waives and releases, for the benefit of William C. Peyton and of any and all beneficiaries under said Will, any right or inter-

est which may now or hereafter accrue to her, to assert or claim any title to or interest in the estate of William C. Peyton, adverse to or inconsistent with the provisions of said Will, either under Section 18 of the Decedent Estate Law of the State of New York or under any other statute or rule of common law now or hereafter existing; and the undersigned especially consents to and approves the provision made for securing continuous direction and control of The Standard Stoker Company, Inc., under Paragraph Fifth of said Will, and expressly agrees to transfer to the corporation organized as therein provided, when such corporation is organized, any and all stock in Peyton-duPont Securities Company and Peyton-duPont, Inc., held by the undersigned at the time of the death of William C. Peyton, and to accept in exchange therefor stock in said new corporation which will entitle the undersigned to a pro rata interest in the earnings and assets of said new corporation, but without voting power.

"ANNE duPONT PEYTON [L. S.]

"Witness:

"Alice Saunders

"William Gore Chambers"

By this arrangement Mrs. Peyton was to give up nothing of her interest in the Stoker Company. The only alteration in her situation was that whereas before the arrangement the stocks through which her interest in the Stoker Company was held, possessed an ultimate voting voice in its management, after the arrangement was completed other stocks having the same ultimate property rights but not having a voting power would be held by her in place of the old.

Mr. Peyton died leaving unrevoked his said will on March 4, 1936. The same has been probated. His executors and trustees, parties hereto, took steps in due time to form the corporation which the will instructed them to organize. The corporation so formed is the defendant and cross-complainant William C. Peyton Corporation. Its capital structure is such that if the executors and trustees exchange Securities Company stock and Peyton-duPont stock held by their testate for the appropriate class of stock

of William C. Peyton Corporation having voting power, and if the shares of Securities Company stock and Peyton-duPont stock which Mrs. Peyton held are exchanged for the appropriate class of stock of William C. Peyton Corporation which does not have voting power, the purposes of the will and agreement will be completely served in accordance with the intention of Mr. and Mrs. Peyton as disclosed in those writings. The details of the capital structure of the new corporation and the charter provisions governing the distribution of its earnings need not be stated.

The executors and trustees are prepared to make the exchange of Mr. Peyton's stock and are ready and willing to do so.

Mrs. Peyton has, however, incapacitated herself from carrying out her part of the agreement. She has transferred to her son, the complainant, the 13,868 shares of Peyton-duPont stock and he is now the registered holder of the same. She has also endorsed for transfer and delivered to her son, as trustee, her certificates for 16,523 shares of the Securities Company. He has not yet become the registered holder of these shares, the Securities Company having refused to make the transfer on its books though requested so to do.

Mrs. Peyton took the position after her husband's death, and continues to adhere to it, that the agreement she is purported to have made is not legal and binding upon her and therefore she was at liberty to do with the shares as she pleased. The grounds upon which she bases her contention will be presently stated and the court's answer thereto set forth.

There is no doubt upon this—that the complainant had full knowledge of all the facts which affected his mother's liberty of action with respect to the shares; and that he is

in no sense a purchaser for value. The stock in his hands is fully subject to whatever equity may exist in favor of the cross-complainants.

1. It is contended first in behalf of the complainant that the instrument which his mother signed in so far as it pertains to her shares of stock is invalid in that it was a promise to transfer her shares to a third corporation, for the purpose of vesting in said corporation the right to vote thereon permanently, in violation of *Section* 18 of the *Delaware Corporation Law* (*Rev. Code* 1935, § 2050).

That section regulates the creation of voting trusts. It limits the legality of voting trusts to those that endure for ten years or less. A voting trust that is created to live for over a period of ten years has been declared by this court in a recent decision to be void. *Perry v. Missouri-Kansas Pipe Line Co., et al., ante* p. 33, 191 *A.* 823. If, then, the arrangement was one for the creation of a voting trust, it was void in law, and Mrs. Peyton was under no legal obligation to go through with it.

But was a voting trust, as the phrase is properly understood, either intended or contemplated? That the arrangement adopted by Mr. and Mrs. Peyton was designed to deprive Mrs. Peyton of the title to stock having voting rights which might be exercised on some future occasion adversely to the existing management of the Stoker Company is perfectly apparent. But this does not necessarily give to the mechanics by which that design was to be effectuated the character of a voting trust. A voting trust as commonly understood is a device whereby two or more persons owning stock with voting powers, divorce the voting rights thereof from the ownership, retaining to all intents and purposes the latter in themselves and transferring the former to trustees in whom the voting rights of all the depositors in the trust are pooled. If a corpora-

tion is formed having two classes of stock, one of which possesses voting power and the other none, we have a plain case where one class of stock, viz., the non-voting class, has of course a very decided property interest in the corporation, but not a particle of vote in its government. In such case there is equitable ownership in the assets but no participation in control. That such a corporation presents no aspect of a voting trust is clear. Our *General Corporation Law*, like most such laws in the other states of the Union, expressly permits the issuance of classes of stock of that character. The stock that has no vote is not of course in a voting trust. It is just a case of a class of stock lacking among its incidents a right to vote.

Now such stock may be lawfully issued. People may buy it and they cannot complain against the non-voting limitation with which it is burdened. If they can buy it, they can pay for it in any form of lawful consideration. They can pay for it in money or in property, real or personal. Shares of stock of a corporation are personal property and as such constitute a good consideration in payment for the shares of stock of another company.

What Mrs. Peyton agreed to do was, in substance, to purchase shares of non-voting stock in a company to be organized and to pay for the same in shares of stock already held by her in two companies, which latter shares happened to have the quality of voting rights.

That is the light in which this aspect of the case presents itself. The proposition was not that Mrs. Peyton should retain her shares in the Securities Company and in the Peyton-duPont Company, divorced from their voting rights. If that had been the case, a voting trust would have resulted. So far was that from being the case, that when she had finished with carrying out her agreement, she would no longer be a stockholder of any kind in the

Securities Company or in Peyton-duPont, Inc. She would
be a stockholder in an entirely new corporation, her stock
in that corporation having no voting rights.

I conclude that her promise was not to place her stock
in a voting trust.

2. Under this head it is contended that the promise
of Mrs. Peyton to transfer her shares was without consid-
eration and hence was a nullity.

That mutual promises may constitute mutually lawful
considerations is not denied by the complainant. There is
nothing peculiar to posthumous dispositions which removes
them from the reach of promises as a consideration for an-
other's promise or act. This is exemplified in the cases
where a promise is made to dispose of property in a certain
way after death in consideration of a present act, *Johnson
v. Hubbell*, 10 *N. J. Eq.* 332, 66 *Am. Dec.* 773; *Phalen v.
U. S. Trust Co.*, 186 *N. Y.* 178, 78 *N. E.* 943, 7 *L. R. A.
(N. S.)* 734, 9 *Ann. Cas.* 595; *Taylor v. Mitchell*, 87 *Pa.*
518, 30 *Am. Rep.* 383; *Manning v. Pippen*, 86 *Ala.* 357, 5
*So.* 572, 11 *Am. St. Rep.* 46; and also in the cases where
joint, mutual or reciprocal wills are promised to be made.
*Defour v. Pereira*, 1 *Dick.* 419, 21 *English Reprint* 332;
*Deseumeur v. Rondel*, 76 *N. J. Eq.* 394, 74 *A.* 703; *Wright
v. Wright*, 215 *Ky.* 394, 285 *S. W.* 188; *Brown v. Webster*,
90 *Neb.* 591, 134 *N. W.* 185, 37 *L. R. A. (N. S.)* 1196; *Curry
v. Cotton*, 356 *Ill.* 538, 191 *N. E.* 307; *Crofut v. Layton*, 68
*Conn.* 91, 35 *A.* 783; *Smith v. Furst*, 186 *App. Div.* 452, 174
*N. Y. S.* 481; *Mueller v. Batcheler*, 131 *Iowa*, 650, 109 *N. W.*
186. In the first of the foregoing group of cases the con-
sideration for the promise to make a certain disposition of
property upon death, is supported by a consideration that
was executed; in the second by the consideration of an
executory promise. The promise to execute the will as
agreed is equally binding in the one class of cases as in the

other. While the survivor has the power to decline to make a will as agreed or to revoke one that has already been made in accordance with the agreement, and thereby breach his agreement, yet if the agreement be shown a court of equity will enforce it. The foregoing citations abundantly establish that proposition.

The solicitors for the complainant do not question the rule which the foregoing and other authorities that might be cited overwhelmingly establish. They say, however, that the cited cases and the principle they establish have no applicability here upon the question of whether Mrs. Peyton received any consideration for the promise she made.

If I correctly comprehend the argument by which they seek to distinguish this case from the principle of those, it is this—that in those cases there was a definite promise by the person whose testamentary disposition was pledged that he would in fact make such disposition, whereas in this case there was no such promise by Mr. Peyton. It is quite true that the evidence fails to show a binding promise by Mr. Peyton to execute the sort of will which was submitted to Mrs. Peyton in draft form. The fact is, however, that he did execute and leave unrevoked a will that conformed with scrupulous fidelity to the will as drawn and submitted to his wife for inspection. This will was executed, as the testator expressly stated at one place in its provisions, in consideration of the promise of his wife to exchange her stock in accordance with the plan he had devised. The will was executed, therefore, in consideration of the promise. If Mr. Peyton had anticipated that the promise would not be fulfilled, we have no right to believe that the will which it induced would ever have been executed. Indeed the instrument by its every intendment refutes such a belief.

Mr. Peyton, says the complainant's solicitors, could

have revoked his will and Mrs. Peyton would have had no ground to complain, he not having bound himself by agreement to die leaving such a will. Hence, it is argued, her promise was purely unilateral and therefore revocable at any time. Prior to Mr. Peyton's death, it may be conceded without deciding that his wife had the right to recall her promise. Until then, it may be conceded arguendo that Mrs. Peyton's so-called agreement amounted to no more than a continuing offer subject at any moment to be withdrawn; that it was as if she had said to her husband—"if you die testate leaving such and such a will, I agree in consideration thereof to do so and so." So conceding, it is nevertheless true that at no time during his life did she alter or vary, not to say retract, what was in effect a continuing declaration to her husband of that promise. Her promise to do as she agreed to do was accepted by him by his act of leaving a will containing not only the precise substance but expressed in the literal terms which her promise contemplated. Now that Mr. Peyton is dead and has faithfully done that which was the consideration for his wife's promise, it is neither right nor just that Mrs. Peyton or those who are volunteers under her should be permitted to repudiate the promise that induced his act. The remarks of Lord Cavender (*Hargrave's Judicial Arguments, p.* 309) are of particular applicability in this connection, when he said:

"No man shall deceive another to his prejudice. By engaging to do something that is in his power, he is made a trustee for the performance, and transmits that trust to those that claim under him. This court is never deceived by the form of instruments. The actions of men here are stripped of their legal clothing, and appear in their first naked simplicity. Good faith and conscience are the rules by which every transaction is judged in this court; and there is not an instance to be found since the jurisdiction was established where one man has ever been released from his engagement after the other has performed his part."

If a man promises to make a certain will in consid-

eration of another's promise or act, the authorities heretofore cited are uniform in holding that the performance of the act requires the leaving of the promised will; and if no such will is left, the courts will in some indirect way, generally by way of enforcing a trust, effectuate the result which the promised will was to accomplish. Conversely, when a will is executed and left by the testator in full effect on the faith of another's promise, which is this case, the same logic and the same underlying considerations of right and justice, demand that, the will having been left, the promise which induced it should be performed. *Lawrence v. Oglesby,* 178 *Ill.* 122, 52 *N. E.* 945.

In this case the will and the promise are to be construed together as in the nature of a contract. *Estate of Whitney,* 171 *Cal.* 750, 154 *P.* 855; *Estate of Wyss,* 112 *Cal. App.* 487, 297 *P.* 100, 103. In the last cited case, there was a will and attached thereto there was a separate paper signed by the widow. In consideration of the promise therein contained the will was executed. After the husband's death, the widow sought to repudiate the obligation of her signed waiver. She was not permitted to do so. The case is parallel to the one *sub judice* in a particular that the complainant's solicitors appear to emphasize as of great importance, viz., in that case as in this one, there appears to have been no promise binding the husband to make and leave unrevoked the will in question. But that circumstance is of no consequence if the testator did in point of fact leave a will which his wife's promise induced. The court in the California case observed upon this point— "Whether or not the parties themselves could later have changed this plan, by agreement, or whether some subsequent act by one of the parties might have released the other, is not determinative of whether or not the wife is bound after the death of the husband, the event in contemplation of which the instruments were made, nothing

having been done by the parties in the meantime." It was further observed that it was of no great consequence whether the instrument be viewed from the standpoint of contract, waiver or of estoppel—the result was the same, regardless of terminology, viz., that the party making the inducing promise was, after the other party acted upon it, bound to perform it.

Under this head of consideration it is further to be noted that Mrs. Peyton received under the will a participation in the estate considerably in excess of what she would have been entitled to under the laws of the testator's domicile defining her rights as widow. Thus a consideration for her promise flowed to her of a material nature in addition to the intangible consideration which inhered in the act of making the will with its peculiar arrangement for future control over the Stoker Company.

Under this head, the conclusion is that there was a good and lawful consideration for the promise made by Mr. Peyton.

3. But even so, it is argued in behalf of the complainant, there was a failure of the consideration and so Mrs. Peyton was relieved of her promise. The alleged failure of consideration cannot of course consist in any omission on Mr. Peyton's part to leave unrevoked the stipulated will. The will was left in full force and duly probated.

It is said, however, that the will in its own terms shows that Mr. Peyton was to leave certain letters of instruction to his widow and to his trustees containing recommendations to the former as to the disposition she should make of the income and to the latter as to the ultimate disposition they should make of the corpus. He never left such letters. Therefore, say the solicitors for the complainant, since Mr. Peyton did not complement the will with the letters, the will as left is incomplete. If so, the contention

analyzes into this, no such testamentary document as her promise contemplated was ever left by her husband.

The absence of these letters appears to be the particular circumstance that has actuated Mrs. Peyton in her repudiation of any obligation to exchange her stock. She says she thought the letters would have made some kind of provision for her son and that the will, without such letters, works an injustice to her son, because it is in the power of the trustees to make such ultimate disposition of the stock they will hold as will leave her son no participation whatever in his father's estate. In view of this injustice, she conceives that she is under no obligation to carry out her agreement.

There are several observations that are rather forcefully responsive to this contention. The first is that Mrs. Peyton's refusal to carry out her agreement will not accomplish the result of admitting her son to a share in his father's estate. In point of result, this litigation presents solely the possible question of the particular personnel that will in the future preside over the destinies of the Stoker Company enterprise. Let that turn out as it may, the son, so long as his father's will stands, will have no assurance of receiving any of his father's estate.

Next it is to be observed, Mr. Peyton's will, which Mrs. Peyton read and the contents of which she was therefore aware of before she made her agreement, very clearly gave nothing to the son. This was not for want of affection and regard for his son. The relations of father and son were exceedingly pleasant. It was because, as the will stated, the members of the testator's immediate family were not in need of financial assistance from him. Mrs. Peyton was therefore advised of the fact that her son was not a beneficiary under the will. It is difficult to see how she can now conceive of that fact as a circumstance that re-

leases her from the promise which was made in the full knowledge of it.

Finally, under this head of discussion, the letters which were not written and the absence of which is the subject of so much comment by the solicitors for the complainant, could not have been understood by Mrs. Peyton as *promised* by her husband. All that the will said with respect to them was that it was Mr. Peyton's *intention* to write such letters. There was no engagement to write such letters. But even if the testator had carried out such fleeting intention, Mrs. Peyton was put on plain notice by the will that the letters, if written, would have no binding effect, and that notwithstanding what her husband might recommend in them, both she and the trustees were left full liberty to disregard his recommendatory views entirely.

The conclusion under this head is that there was not a failure of consideration.

4. The complainant contends that Mrs. Peyton's promise to take stock in a corporation to be thereafter organized was but an offer of a unilateral contract which was withdrawn by her, as was her legal right, prior to its acceptance.

Many cases are cited under this head, going to establish the proposition that an offer to subscribe to stock of a corporation to be formed, may be withdrawn before acceptance, and that there can be no acceptance until the offeree is *in esse*.

I do not conceive it necessary to say more in expressing my view upon this point than to observe that this is not a case where the corporation is seeking to enforce the obligation of a subscription made and withdrawn before the corporation was created. The contract that is sought here to be enforced is one that was made between Mrs. Peyton and

her husband and its enforcement is being sought in behalf of his estate by his executors and trustees. The cases cited by the complainant under this head are clearly distinguishable in that important particular.

5. Lastly it is contended that the promise of Mrs. Peyton was voidable at her election in that the fiduciary relations of husband and wife existed between her and her husband, at whose instance the promise was made; that she had no independent advice with respect thereto; and that the will of her husband was intricate and complex and was not fully understood by her.

It is quite true that the relationship of husband and wife is a confidential one. It is a relationship in which, so long as it is harmonious, trust is mutually reposed and confidence mutually bestowed. And in numerous cases under certain circumstances, it has been adjudged by courts and declared by text writers that any dealings between husband and wife will be carefully scrutinized. But the mere existence of the relationship, standing alone, will not raise a presumption of undue influence practiced by one spouse upon the other in business dealings between them. *Donlon v. Donlon,* 154 *App. Div.* 212, 138 *N. Y. S.* 1039; *McDougall v. McDougall,* 135 *Cal.* 316, 67 *P.* 778; *Sheehan v. Sullivan,* 126 *Cal.* 189, 58 *P.* 543; *Ford v. Ford,* 193 *Pa.* 530, 44 *A.* 561. It will be found from the cases generally, I think, that when the courts have stressed the influence which one spouse is thought to have over the other by reason of the confidential relationship between them, the relationship has been shown to have been abused by an advantage gained by the one at the expense of the other. It was so in all the cases cited in behalf of the complainant here. No case has held that a transaction between a husband and wife which is fair and fully understood by both is open to attack on the mere score of the relationship between them.

Now in the instant case, Mrs. Peyton does not intimate in the slightest way that her husband beguiled her by an abuse of her trust and confidence into executing her agreement. I dare say she would be the first to resent such an imputation.

Mrs. Peyton is an intelligent woman. The proposal submitted to her by her husband was, in my opinion, not such as to warrant the description of intricate and complex, as the solicitors for the complainant describe it. I can see no need nor occasion for saying that she was in need of independent advice. Her husband very accurately described the plan he had in mind and she read the two papers, the will and her agreement, which very clearly set it out.

What she was requested to join in effectuating, contained no feature of improvidence on her part. On the contrary, considering the extent of the power of disposal which her husband had over his own estate, Mrs. Peyton benefited by the will. In return for that benefit, all she gave up was the right in the future, if the occasion should arise, to exercise the voting rights incident to stock she then held in conjunction with others to eject from the control of the Stoker Company those associates of her late husband in whom he had the utmost of confidence as capable and efficient business men. The question which her husband's proposal put before her was a plain business question. It was far from being too complicated for a woman of Mrs. Peyton's manifest intelligence to answer. She answered in the light of her own judgment, without being misled or improperly influenced by any one.

It is said that the effect of the will and agreement was not fully understood by Mrs. Peyton. To this all that I care to say is, that if a person of even normal intellectual capacity, much less one of Mrs. Peyton's apparent mental

strength, deliberately reads papers of readily understandable simplicity after having had the same truthfully described, and signifies his assent thereto in the most formal way, without being led thereto by fraud, undue influence or duress of any character, it must be assumed that the effect of the papers was fully understood. This court has gone so far as to say that even in the case of a written contract signed by a person too illiterate to read it, the obligation is binding when the other party to it had no reason to know of the illiteracy of the signer. *Sharpless-Hendler Ice Cream Co. v. Davis,* 17 *Del. Ch.* 321, 155 *A.* 247.

The bill should be dismissed and the cross-complainants should have their relief against the complainant as prayed.

Decree accordingly.

NOTE. From the decrees entered in accordance with the foregoing opinion, appeals were taken to the Supreme Court, and the decrees reversed. The opinion of the Supreme Court will hereafter be reported in the *Delaware Chancery Reports.* See also 7 *A.* 2d 737.