CRABTREE, J.T.C.
This is a corporation business tax case wherein plaintiff seeks review of defendant’s determinations (a) that plaintiff’s indebtedness to General Motors Acceptance Corporation (GMAC) should be included in plaintiff’s net worth for the fiscal years ended August 31, 1975, August 31, 1976 and August 31, 1977 *200 and (b) that 90% of the interest on such indebtedness would be disallowed as deductions in determining plaintiffs entire net income for the same years. The deficiency assessments resulting from those determinations were:
8/31/75 8/31/76 8/31/77
$25,416.23 $24,761.78 $30,436.12
The determinations were based upon defendant’s conclusion that the indebtedness in question was owed directly or indirectly to a creditor holding at least 10% of plaintiff’s outstanding capital stock within the purview of N.J.S.A. 54:10A-4(d)(5) and 4(k)(2). Plaintiff argues that the determinations are erroneous because the capital stock of plaintiff issued to GMAC was held in a voting trust throughout all three taxable years and, thus, the voting trust, not GMAC, was the “holder” of the stock within the meaning of the applicable statutes. Plaintiff argues, in the alternative, that it is entitled to deduct the full amount of interest paid on the GMAC indebtedness by virtue of N.J.S.A. 54:10A-4(k)(2)(E)(ii), which permits such a deduction when stock and debt are issued pursuant to a plan of reorganization.
The facts have been fully stipulated. Plaintiff, a Delaware Corporation with its principal place of business in Illinois, is engaged in the business of leasing motor vehicles both directly to the public and through retail automobile dealers. Its retail leasing operations involve automobiles manufactured by General Motors Corporation and are conducted primarily through authorized General Motors dealers.
From its inception in 1965, plaintiff financed the purchase of its vehicles through loans from GMAC (a subsidiary of General Motors) and five commercial banks.
In 1968, Tetra Development Corporation acquired more than 40% of plaintiff’s common stock and installed its own controlling shareholders as directors and senior executives of plaintiff. As a result of various intercorporate transactions between 1968 and 1971, Tetra became indebted to plaintiff for more than $2,000,000. In addition, during the same period plaintiff suffered heavy operating losses and accumulated a total indebted *201 ness to GMAC and the banks of over $10,000,000. During this period, however, neither GMAC nor the banks owned any of plaintiff’s capital stock.
In early 1971, plaintiff, its principal creditors (including GMAC) and Tetra embarked on the first of a series of steps designed to save plaintiff and protect its lenders. In February of that year, plaintiff entered into a standby agreement with GMAC and the banks in an effort to preserve plaintiff’s ability to obtain new vehicles. Pursuant to the standby agreement the creditors agreed not to demand repayment of their outstanding loans to plaintiff for so long as GMAC continued to make vehicle financing available to plaintiff, provided that plaintiff’s net worth did not decrease by an amount specified in the standby agreement.
Simultaneously with the execution of the standby agreement GMAC also loaned Tetra the sum of $2,700,000. Tetra immediately paid over the loan proceeds to plaintiff in full satisfaction of Tetra’s $2,000,000 obligation to plaintiff.
Then, in May 1971 GMAC and plaintiff entered into a master loan and security agreement for credit financing and repayment of plaintiff’s purchases of vehicles for its leasing operations. That agreement will be referred to hereafter as the master loan agreement.
Despite these efforts to stabilize plaintiff’s finances, its financial condition worsened in 1971 to a point where, by September, its net worth had declined below the amount prescribed by the standby agreement. Consequently, in an effort to prevent further erosion of plaintiff’s financial situation, the parties in September 1971 amended the standby agreement to provide that (a) for the benefit of the banks and GMAC, GMAC would have control of plaintiff’s cash receipts and disbursements, (b) the banks would forebear on demands for repayment of their outstanding loans, and (c) GMAC would make additional vehicle financing available to plaintiff, provided that plaintiff’s net worth did not decrease below a newly designated amount.
*202 Plaintiff’s financial condition continued to deteriorate through the early months of 1972. In May of that year, when plaintiff’s overdue indebtedness to GMAC had grown to almost $3,000,000, GMAC advised plaintiff that it would not continue to finance plaintiff’s automobile purchases unless plaintiff effected a reorganization. Throughout the summer of 1972 plaintiff’s board of directors endeavored with various interested parties, including GMAC and the banks, to develop alternatives for reorganizing plaintiff’s finances that would be acceptable to plaintiff’s creditors and shareholders.
In the fall of 1972, the parties reached an agreement in principle on a plan of reorganization for plaintiff that would keep plaintiff alive while protecting the interests of its creditors and shareholders. In contemplation of the intended reorganization the banks, GMAC and plaintiff further amended the standby agreement to provide that it would terminate upon the completion of plaintiff’s reorganization, and GMAC relinquished control of plaintiff’s cash accounts.
On October 4, 1972 plaintiff’s board of directors unanimously approved the proposed reorganization agreement among plaintiff, the banks, GMAC, holders of plaintiff’s subordinated notes and preferred stock and the largest holders of its common shares and authorized the necessary measures to complete the reorganization including submission of the reorganization plan to the annual meeting of plaintiff’s shareholders in early 1973.
GMAC and the banks recognized that, unless the reorganization were approved, plaintiff would not survive and its creditors could not hope to recover the full value of their loans. The parties agreed that it was necessary to assure shareholder approval of the reorganization plan and that the support of Tetra’s 41% block of plaintiff’s stock was essential to achieving that objective. '
Therefore, in aid of assuring shareholder approval of plaintiff’s reorganization, GMAC, on October 20, 1972, acquired from Tetra approximately 12% of plaintiff’s outstanding common stock, together with certain personal liabilities of Tetra’s *203 principals, in full satisfaction of Tetra’s outstanding $2,700,000 indebtedness to GMAC under the February 19, 1971 loan arrangement. At the same time the banks acquired the remainder of Tetra’s holdings of plaintiff’s common stock (approximately 30% of the outstanding shares) in full satisfaction of certain indebtedness of Tetra to the banks. Simultaneously GMAC advised plaintiff of its intention to place its newly acquired shares of plaintiff and all additional common stock of plaintiff acquired by GMAC in connection with the reorganization into an irrevocable voting trust.
While the summary of the reorganization plan, included in the proxy statement sent to plaintiff’s shareholders, indicates GMAC’s intention to place its shares of plaintiff’s capital stock into a voting trust, the record in this case does not indicate that GMAC was under any contractual obligation to do so.
Under the reorganization agreement, plaintiff’s debts and stock capitalization were to be restructured as of September 1, 1972. This was to be effectuated through an exchange of its principal creditors’ indebtedness for plaintiff’s stock. Of particular significance in this connection was GMAC’s agreement to accept shares of plaintiff’s stock in exchange for the cancellation of plaintiff’s then-existing and overdue indebtedness of 3.1 million dollars.
The reorganization was approved by a majority of the holders of plaintiff’s subordinated notes in January 1973 and by plaintiff’s common and preferred shareholders at the annual meeting on February 14, 1973. The Delaware Chancery Court, by order of January 23, 1973, declared the reorganization binding upon all holders of plaintiff’s subordinated notes. The closing of the reorganization took place on February 14, 1973, immediately following the annual meeting, at which time:
(1) GMAC exchanged its 3.1 million dollars of overdue indebtedness for approximately 21% of the outstanding shares of plaintiff’s common stock and additional shares of a new issue of preferred stock, thereby transforming plaintiffs indebtedness into capital stock. The banks, the holders of plaintiffs subordinated notes, and the holders of plaintiff’s then-existing preferred stock similarly exchanged the debts owed to them for plaintiffs stock.
*204 (2) GMAC sold 239,600 shares of plaintiff’s common stock to Derek W. Draycott, plaintiff’s new president. After that transaction GMAC held approximately 19.6% of plaintiff’s issued and outstanding common stock.
(3) GMAC deposited all of its shares of plaintiff’s common stock into an irrevocable voting trust pursuant to a voting trust agreement among GMAC, as the grantor, and the Northern Trust Company and two individuals unaffiliated with GMAC as the voting trustees. None of plaintiff’s shareholders other than GMAC was a grantor, beneficiary or participant in the voting trust.
At this point, i.e., following the execution of the voting trust, GMAC held of record no shares of plaintiffs common stock. GMAC held of record only its shares of plaintiffs new preferred stock, or less than 1% of plaintiffs capital stock of all classes.
Under the terms of the voting trust, legal title to the shares issued to GMAC in the reorganization was transferred to the trustees of the voting trust, who as the holders thereof, had the unqualified and independent right and power to vote the shares and to execute proxys with respect to those shares. Under the voting trust the trustees possessed “the same powers, rights and discretions as an absolute and independent owner” of the shares. The trustees, however, were not given the right to sell, exchange or otherwise dispose of or encumber the shares; nor were the trustees permitted to vote for or against a proposed recapitalization, merger or consolidation of plaintiff or a proposed sale of substantially all of plaintiffs assets.
The voting trust provided that all dividends or other distributions with respect to the capital stock of plaintiff held in the voting trust would be paid to the registered holder of voting trust certificates, i.e., GMAC or any other person or entity to whom GMAC transferred all or part of its shares of plaintiffs capital stock.
The voting trust terminated according to its terms on the earliest of December 1, 1982, the transfer of all the shares in the manner contemplated by a specific trust provision or plaintiffs complete liquidation or dissolution.
The voting trust further provided that the trustees thereof were to receive reasonable compensation for their services from GMAC; and that the voting trustees incurred no responsibility *205 in any capacity except for their own malfeasance. GMAC also agreed to indemnify the voting trustees and to hold them harmless from any and all expenses, costs and other liabilities arising from their conduct as voting trustees.
Finally, the voting trust provided that it was to be governed and construed in all respects in accordance with Delaware law.
During the term of the voting trust no dividends were paid on the shares held thereunder. The sole acts of the trustees during such term were to meet annually and jointly sign the proxys for the annual shareholders’ meeting solicited by plaintiff.
Following the reorganization and the execution of the voting trust plaintiff undertook to retire the common stock held by the voting trust. Specifically, plaintiff purchased and retired 75% of the shares held by the trustees of the voting trust (approximately 16% of plaintiff’s outstanding common stock) on September 1, 1977, the first day of its 1978 fiscal year, and redeemed the remaining 4% of plaintiff’s common stock held by the trustees on April 15, 1980, at which time the voting trust terminated pursuant to its terms.
Meanwhile, after the closing of the reorganization, plaintiff regularly purchased new vehicles for its leasing business and financed those purchases through GMAC.
During the fiscal years in issue plaintiff was indebted to GMAC for vehicle financing and paid interest thereon as follows:
Indebtedness Interest paid
Fiscal year to GMAC to GMAC
1975 $ 51,802,392 $5,746,218
1976 65,706,718 5,464,190
1977 100,940,742 6,330,902
I.
During the years in issue N.J.S.A. 54:10A-4(d) required that, in computing net worth under the Corporation Business Tax Act, a corporation include “the amount of all indebtedness owing directly or indirectly to holders of 10% or more of the *206 aggregate outstanding shares of the taxpayer’s capital stock of all classes, as of the close of a calendar or fiscal year ...” Similarly, N.J.S.A. 54:10A-4(k)(2)(E) mandates that entire net income be calculated without the deduction of “90% of interest on indebtedness owing directly or indirectly to holders of 10% or more of the aggregate outstanding shares of the taxpayer’s capital stock of all classes ...” The issue is the same for both net worth and interest deduction purposes, i.e., whether GMAC or the voting trust was the direct or indirect holder of 10% or more of plaintiff’s outstanding capital stock of all classes.[1] It is not disputed that, during all the years in issue, GMAC held voting trust certificates evidencing beneficial ownership of more than 10% of plaintiff’s common stock outstanding. Plaintiff maintains that GMAC was not a holder of 10% or more of plaintiff’s common stock because the shares were held by the trustees of the voting trust and GMAC merely held voting trust certificates. The trustees, plaintiff continues, were thus the “holders” of the shares within the contemplation of the statute.
Defendant argues, on the other hand, that “holder” is synonymous with beneficial owner.
In the view the court takes of this case a resolution of the parties’ contentions, essentially advanced within the elastic framework of statutory construction, is unnecessary. The dis-positive feature as far as the “holder” issue is concerned is the relationship between GMAC and the voting trust. If that relationship is one of principal and agent and nothing more, then the voting trust holds the shares of plaintiff’s stock as GMAC’s agent, in which case GMAC is the holder within the purview of the tax statute under review. It is thus appropriate *207 to examine the voting trust agreement, as not all trusts with voting rights are voting trusts. Oceanic Exploration Co. v. Grynberg, 428 A.2d 1 (Del.Sup.Ct.1981).[2] Whether an instrument denominated as a voting trust is in fact and law a voting trust or something else must be ascertained from the instrument read as a whole. Aldridge v. Franco Wyoming Oil Co., 24 Del.Ch. 126, 7 A.2d 753 (Del.Ch.1939), aff’d 24 Del.Ch. 349, 14 A.2d 380 (Del.Sup.Ct.1940). The provisions of the agreement determine its legal effect. Abercrombie v. Davis, 36 Del.Ch. 371, 130 A.2d 338 (Del.Sup.Ct.1957).
The most striking feature of the alleged voting trust agreement in this case is the fact that only one shareholder (GMAC) is a party thereto. As the court observed in Peyton v. William C. Peyton Corp., 22 Del.Ch. 187, 194 A. 106 (Del.Ch.1937):
A voting trust as commonly understood is a device whereby two or more persons owning stock with voting powers divorce the voting rights thereof from the ownership, retaining to all intents and purposes the latter in themselves and transferring the former to trustees in whom the voting rights of all the depositors in the trust are pooled. [22 Del.Ch. 187, 194 A. at 111; emphasis supplied]
As a leading commentator has observed “At the bottom of a voting trust is an agreement among stockholders.” 5 Fletcher, Encyclopedia of the Law of Private Corporations, (1976), § 2077 at 336. The applicable statute 8 Del. Code Ann. § 218, 64 Del. Laws c. 112, provides that “one or more stockholders” may create a voting trust; yet, notwithstanding the reference to one stockholder, the Delaware Supreme Court has stated: “[T]he statutory language contemplates an association of stockholders whether it be created by way of individual agreements or joint agreements ...” Oceanic Exploration Co. v. Grynberg, supra, 428 A.2d at 6.
The Delaware Supreme Court has also held that the principal purpose of a voting trust is to acquire voting control of a corporation. Lehrman v. Cohen, 43 Del.Ch. 222, 222 A.2d 800 (Del.Sup.Ct.1966).
*208 One is left to conjecture what it was that GMAC hoped to accomplish by depositing its shares of plaintiff’s common stock with the voting trust. Certainly it exercised no greater voting control over the conduct of plaintiff’s business than it was able to exercise before the voting trust was created. There was no pooling arrangement with other shareholders as GMAC was the only shareholder participating in the voting trust. The only practical effect of the voting trust was to give the trustees GMAC’s voting proxy for up to nine years, thereby circumventing the three-year limitation on proxy voting imposed by 8 Del. Code Ann. § 215, 63 Del. Laws §§ 5, 6.
Moreover, the voting trustees were precluded from voting on structural changes in the corporation such as merger, consolidation and sale of assets; the voting trustees could not dispose of or encumber GMAC’s shares of plaintiff’s stock; all dividends on the shares were payable to GMAC; and the trust was terminable virtually at will by GMAC upon the latter’s surrender of its voting trust certificates and certification that its shares would be immediately transferred to a third party.
It is readily apparent from the foregoing that the alleged voting trust created nothing more than an agency relationship between GMAC and the voting trustees, who held the shares in question as the agent of GMAC, the holder. GMAC thus never relinquished its status as the holder of more than 10% of plaintiff’s common stock. Plaintiff’s indebtedness to GMAC is thus includible in plaintiff’s net worth for the taxable years in issue.
II.
Plaintiff contends in the alternative that the statutory exemption for corporate reorganizations applies to the interest deduction in the determination of plaintiff’s entire net income, and, thus, that GMAC’s ownership of more than 10% of plaintiff’s outstanding capital stock is irrelevant.
The statute disallows a deduction for 90% of interest on indebtedness owing directly or indirectly to the holders of 10% *209 or more of a corporation’s aggregate outstanding shares; except that the deduction is allowed in full to the extent that it relates to bonds or other evidences of indebtedness issued with stock, pursuant to a bona fide plan of reorganization, to persons who, prior to such reorganization, were bona fide creditors of the corporation or its predecessors, but were not stockholders or shareholders thereof; ... [N.J.S.A. 54:10A-4(k)(2)(E)(ii).]
Even assuming arguendo that plaintiff’s reorganization qualified under the statute, plaintiff’s argument fails for two reasons. First, no bonds or evidences of indebtedness were issued in connection with plaintiff’s reorganization. To the contrary, a portion of plaintiff’s indebtedness to GMAC was canceled in exchange for newly issued preferred and common stock. Secondly, GMAC owned stock in plaintiff prior to the reorganization, having acquired some of plaintiff’s common stock from Tetra on October 20, 1972. The reorganization was not consummated until February 14, 1973.
Accordingly, plaintiff is not entitled to the exemption of N.J.S.A. 54:10A-4(k)(2)(E)(ii); and 90% of the interest on plaintiff’s indebtedness to GMAC is disallowed in determining plaintiff’s entire net income for the taxable years in issue.
Judgment will be entered affirming defendant’s deficiency assessments for all years involved in this proceeding.

 This court has recognized that "the statutory provisions on indebtedness and interest go hand-in-hand and that a decision on the includibility of the indebtedness in plaintiffs net worth will control as to the deduction of interest.” Skyline Industries, Inc. v. Taxation Div. Director, 3 N.J. Tax 612, 618 (Tax Ct.1981). But cf. plaintiffs alternative contention concerning the reorganization exemption embodied in N.J.S.A. 54:10A-4(k)(2)(E)(ii) relating to the interest deduction only.

 The voting trust in this case provides that its provisions will be construed according to Delaware law.