Jack J. GRYNBERG, Celeste C. Grynberg, Celeste C. Grynberg as sole trustee for Rachel Grynberg, Stephen Grynberg and Miriam Grynberg, Celeste C. Grynberg and Dean Smernoff as co-trustees for Rachel Grynberg, Stephen Grynberg and Miriam Grynberg and Oceanic Holding Company, a Colorado Corporation, Plaintiffs,

v.

Gene E. BURKE, Marc Waucquez, William E. Foster, Wesley N. Farmer, Melvin M. Fenichell, Thomas J. Vogenthaler, Norman J. Singer and Oceanic Exploration Company, a Delaware Corporation, Defendants.

Civ. A. No. 5198.

Court of Chancery of Delaware, New Castle.

Submitted Oct. 5, 1979.

Decided Dec. 11, 1979.

David A. Drexler, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Alan S. Weitz, and David J. Freeman, of Ginsburg, Feldman & Bress, Washington, D. C., for plaintiffs.

Edward B. Maxwell, II, of Young, Conaway, Stargatt & Taylor, Wilmington, and Steven M. Umin, and David D. Aufhauser, of Williams & Connolly, Washington, D. C., for defendant Oceanic Exploration Co.

R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, for the individual defendants as their interests may appear.

BROWN, Vice Chancellor.

This case is again before the Court on the cross-motions for summary judgment. Previously, motions be each side for summary judgment were denied. See *Grynberg v. Burke*, Del.Ch., 378 A.2d 139 (1977). The suit is an attempt by the plaintiffs to extricate themselves from the effect of an agreement entered into on February 10, 1976, as amended by a subsequent agreement of June 2, 1976, whereby they surrendered shareholder voting control of the defendant corporation, Oceanic Exploration Company (referred to hereafter as either "Oceanic" or "the corporation") to persons who are aligned with current management of the corporation. It is not disputed that

the purpose of the aforesaid agreements was to set up a form of voting trust whereby the shares of Oceanic owned by the plaintiffs would be voted by others, designated as voting trustees, for a specified period of time. Collectively, the plaintiffs own 76 per cent of the outstanding shares of Oceanic. By the original agreement they intended to turn over voting control of 51 per cent of Oceanic's stock to the voting trustees. By the amendment, they purported to give the voting trustees voting control over their entire 76 per cent holdings.

Several months after the June 2, 1976 amendment, plaintiffs brought this suit to set aside the voting trust agreement on the grounds that they had been induced to enter into it because of fraudulent misrepresentations on the part of the individual defendants. Later, they moved for summary judgment on the theory that the agreements were invalid because they imposed an illegal restraint on their right to alienate their stock interests. Defendant Oceanic moved for summary judgment on the counter proposition that under certain portions of the Delaware General Corporation Law the restrictions imposed on the transfer of the stock by the agreements were valid as a matter of law. For the reasons set forth in the aforesaid reported decision, both motions were denied.

Oceanic has now moved for summary judgment on the premise that the undisputed, material facts of record subsequently produced through discovery and pre-trial affidavits, clearly show that the factual representations made to induce plaintiffs to enter into the voting trust agreements were true and that the action thus induced was necessary to the survival of the corporation. Plaintiffs, in addition to disputing this, have mounted another legal attack upon the validity of the voting trust itself. This time, as I understand it, they take the position that, first, the June 2 agreement is invalid since it attempted to extend the duration of the voting trust in violation of 8 *Del.C.* § 218(b). Second, they argue that no voting trust was validly constituted by the June 2 agreement since it called for a deposit of shares into the trust which, at the time, were held by others as a pledge of security for debts of the corporation. Third, plaintiffs take the position that even if these two impediments can somehow be considered as having been overcome, they nonetheless effectively terminated any voting trust by a letter of revocation sent by them to the corporation and the defendant voting trustees under date of October 15, 1976.

It is appropriate to deal first with the arguments made by the plaintiffs because, if they are correct and the trust has either been rendered invalid or revoked in the eyes of the law, it becomes unnecessary to consider, at this stage, the allegations of fraud which are said to have brought it about in the first place. The basic facts applicable to the legal arguments of the plaintiffs are hereafter set forth.

The plaintiffs are Jack J. Grynberg, Celeste C. Grynberg (his wife), Celeste C. Grynberg as trustee for Rachel Grynberg, Stephen Grynberg and Miriam Grynberg (these being the children of Jack and Celeste Grynberg), Celeste Grynberg and Dean Smernoff, co-trustees for the aforesaid children under a separate trust, and Oceanic Holding Company, a corporation owned and controlled by Jack Grynberg. In varying amounts, the aforesaid 76 per cent stock ownership interest in Oceanic is held of record by these plaintiffs in the aforesaid capacities. It is not disputed that prior to the February 10 agreement Jack Grynberg, as the original guiding force behind Oceanic, controlled all of such shares. Prior to the execution of the original agreement here in issue, Jack Grynberg was in control of Oceanic and its policies.

By February 1976, Oceanic was in deep financial trouble, several large loans were overdue, and, as to one such loan, Morgan Guaranty Trust Company of New York had filed suit for recovery. It was at this point that the voting trust concept was suggested and put into effect. Without going into the contested details at this point, it is sufficient to note that with the surrender of voting control of the corporation by means

of the voting trust, Morgan Guaranty Trust Company withdrew its lawsuit and extended the loan. With this, I turn to the basic terms of the two agreements.

The written agreement of February 10, 1976, was entitled "Voting Trust Agreement." The parties were the plaintiffs (designated as the "Stockholders") as parties of the first part, and "Gene E. Burke, Burton S. Goldberg, and Marc Waucquez (hereinafter called the 'Voting Trustees'), parties of the second part." The purpose, or "whereas" clause, recited that the Stockholders (being the plaintiffs) deemed it for the best interests of the corporation to act together concerning the direction of the affairs of the corporation so as to secure continuity and stability of policy and management and, to that end "to cause to be vested in the Voting Trustees at least fifty-one percent (51%) of the votes of all the corporation's outstanding shares." Thereafter, the plaintiffs, by the signing of the agreement, committed themselves to transfer specified amounts of their holdings constituting 3,628,560 shares to the "Voting Trustees." The agreement provided for the form and issuance of voting trust certificates to the plaintiffs by the voting trustees. It recognized that new share certificates would be issued by the corporation in the name of the voting trustees. The voting trustees were given the right to vote the stock on matters which might come before them at any stockholders' meeting, including the election of directors, according to their best judgment. Holders of the voting trust certificates were expressly denied the right to vote with respect to any of the stock held by the voting trustees. Such certificate holders were, however, entitled to receive all dividends on the stock held by the voting trustees as well as to a return of the share certificates upon termination of the trust.

As to the duration of the agreement, the document stated as follows:

"The term of this Agreement shall be *four years* from the date hereof, however, should the Prinos Oil Field located offshore Greece go on production for a period of fifteen (15) continuous days, prior to such termination date, then this Agreement shall terminate as of the end of said fifteenth day. Termination shall be without notice by or action of the Voting Trustees, but, at any time, this Agreement may be terminated by a majority of the Voting Trustees, in their discretion, . . . ."

For reasons which it is unnecessary to go into for the purpose of their motion, the plaintiffs, on June 2, 1976, executed a second document which purported to enlarge the amount of stock covered by the trust as well as to extend the four-year term of the February 10 agreement to a period of five years commencing on June 2, 1976. This document of June 2 was entitled "Amendment to Voting Trust Agreement and Purchase Option Agreement." It is an unusual document in the sense that although it purported to amend the original agreement, it was executed only by the plaintiffs, on the one part, and by the defendant corporation, Oceanic, on the other. It was not executed by Burke, Goldberg and Waucquez, the voting trustees who were signatories to the original agreement. Nor were they included as parties to it. By the same token, Oceanic was not a party to the February 10 agreement. However, at paragraph "Eighth" of the June 2 agreement it is stated that "The Stockholders [plaintiffs] agree that their execution of this Agreement constitutes their approval of the amendments contained herein to the Voting Trust Agreement." Later, by separate telegrams to the corporate secretary of Oceanic, both Burke and Goldberg gave their consent to the amendments to the February 10 agreement. Apparently, the third voting trustee, Wancquez, never gave any formal or written indication of his consent.

The parties have made no issue of this and are content to accept the June 2 agreement as a document binding upon them to the extent that its terms purport to extend the maximum duration of the voting trust from a four-year term ending February 9, 1980, to a five-year plus term ending June

1, 1981. Accordingly, I make no issue of it either. I do take note, however, that with regard to an extension of a voting trust it is provided as follows at 8 *Del.C.* § 218(b):

"The voting . . . trustees shall, prior to the time of expiration of any such voting trust agreement, as originally fixed or as previously extended, as the case may be, file in the registered office of the corporation in this State a copy of such extension agreement and of . . their consent thereto, and thereupon the duration of the voting trust agreement shall be extended for the period fixed in the extension agreement; but no such extension agreement shall affect the rights or obligations of persons not parties thereto."

By this observation, I simply wish to make it clear that since the matter is not in issue here, the Court has not necessarily given its blessing to an extension of a voting trust accomplished by a subsequent written agreement executed between the depositing stockholders and a nonparty to the original trust agreement where the only attempt to comply with the statute on the part of the voting trustees is comprised of a writing which does not bear their signatures. Having thus digressed, I return to the facts.

In addition to purporting to extend the terms of the voting trust, the June 2 agreement contained two other features which bear significance to the present motion of the plaintiffs. First, as its title indicates, it contained an option agreement between plaintiffs and Oceanic. By this plaintiffs granted the corporation an option for a period of five years commencing June 2, 1976, to purchase all or any part of the plaintiffs' 76 per cent holdings in Oceanic. An option purchase price was established at a figure which was 50 per cent of the then market value of Oceanic shares. The option price was made to thereafter increase by 10 per cent per year on each anniversary date of the June 2 agreement. As to the consideration being given by Oceanic in return for the execution of the June 2 agreement by the plaintiffs, the document recited that the corporation agreed to indemnify and hold the plaintiffs harmless from any

liabilities they might thereafter incur "as a result of their guarantees of loans from and pledges of shares" to four designated creditors of the corporation. These loan creditors were Morgan Guaranty Trust Company of New York, Manroga Limited (a corporation influenced to some degree by General Samoza, then the governing official of Nicaragua), Central Bank of Denver, and Western Geophysical, Inc. As further consideration the corporation covenanted to use all available corporate funds to first pay the obligations owed to the aforesaid loan creditors. This leads to the other significant feature of the June 2 agreement.

In that portion of the agreement which amended the February 10 agreement by increasing the total number of shares to be placed in the voting trust from 3,628,560 shares to a total of 5,222,558 shares, it is recited as follows:

"Certain of the above shares are not in the possession of the Stockholders having been pledged by the Stockholders to Central Bank of Denver, 1,895,323 shares: Manroga Limited, 1,549,058 shares: Morgan Guaranty Trust Company of New York, 1,000,000 shares to secure Company [Oceanic] obligations. Upon payment of the obligations to said creditors by the Company the Stockholders will issue appropriate instructions to the said creditors to deliver said shares to the Secretary of the Company for deposit in Voting Trust."

From this language two things are easily computed. First, 4,444,381 shares of the total of 5,222,558 shares to be included in the voting trust by the June 2 amendment were physically incapable of being deposited or transferred by the plaintiffs to the voting trustees at the time because they were being held by creditors as pledges made by the plaintiffs to secure the payment of corporate obligations. Second, the deposit of 3,628,560 shares to the voting trust called for by the February 10 agreement apparently could not have been made since all but 778,177 shares of plaintiffs' combined 76 per cent holdings had obviously been pledged and surrendered to others

*by the plaintiffs* to secure corporate obligations of Oceanic.

It does appear that subsequent to the execution of the June 2 agreement, certain of these loan obligations were satisfied, certain pledged shares released to the voting trustees and voting trust certificates issued in place thereof. Significantly, however, the loan obligation to Central Bank of Denver was not paid by Oceanic. Rather, new collateral was substituted by Oceanic for the shares pledged by plaintiffs. As a result, these shares were returned to plaintiffs by the bank and they have since remained in plaintiffs' possession. Thus, 1,895,323 shares of those covered by the June 2 agreement have never been deposited with, or transferred to, the voting trustees.

Based upon the foregoing circumstances, the plaintiffs now advance three arguments. They say that under 8 *Del.C.* § 218 and the case decisions interpreting this and the predecessor statutes governing voting trusts, the June 2 amendment was void because the attempt to extend the voting trust was not executed within two years of the expiration of the original four-year term as required by § 218(b). Secondly, they say that the June 2 amendment is void since it attempted to create a voting trust of pledged stock which was not capable of being surrendered in exchange for voting trust certificates as called for by the agreement. Third, plaintiffs say that since they collectively comprised all the settlors as well as all the beneficiaries of the trust, it was within their power to revoke it at will, which they did on October 15, 1976.

Before reaching these arguments, however, it is necessary to deal with a threshold question, namely: Is the voting trust arrangement here governed by § 218? Oceanic argues that it is not and, since plaintiffs' arguments all stem from the assumption that the statute is applicable, if Oceanic is correct all of plaintiffs' arguments may be rendered moot. Accordingly, I proceed to analyze the situation in the following manner, *with* apologies in advance for the length of the undertaking which, unfortunately, cannot be avoided.

## I.

As noted, the statute which governs voting trusts of corporate stock of a Delaware corporation is 8 *Del.C.* § 218. The pertinent portions of this statute, excerpted so as to fit the facts of this case, are as follows:

"(a) One or more stockholders may by agreement in writing deposit . . . or transfer capital stock to any . . . persons . . . authorized to act as trustee for the purpose of vesting in such . . . persons . . . who may be designated voting . . . trustees, the right to vote thereon for any period of time determinated by such agreement, not exceeding 10 years, upon terms and conditions stated in such agreement, . . . . The agreement may contain any other lawful provisions not inconsistent with such purpose. After the filing of a copy of the agreement in the registered office of the corporation in this State, which copy shall be open to the inspection of any stockholder of the corporation or any beneficiary of the trust under the agreement daily during business hours, certificates of stock shall be issued to the voting . . . trustees to represent any stock of an original issue so deposited with . . . them, and any certificates of stock so transferred to the voting . . . trustees shall be surrendered and cancelled and new certificates therefor shall be issued to the voting . . . trustees. In the certificate so issued it shall be stated that they are issued pursuant to such agreement, and that fact shall also be stated in the stock ledger of the corporation . . . . .

"(b) At any time within 2 years prior to the time of expiration of any voting trust agreement as originally fixed . . . 1 or more beneficiaries of the trust under the voting trust agreement may, by written agreement and with the written consent of the voting . . . trustees, extend the duration of the voting trust agreement for an additional period not

exceeding 10 years from the expiration date of the trust as originally fixed . . . ."

Subsection (c) of the statute goes on to specifically recognize the validity of an agreement between two or more shareholders (sometimes referred to as a "pooling agreement") to vote their shares in a certain way, subject to specified time limitations, and thereafter § 218(e) states as follows:

"(e) This section shall not be deemed to invalidate any voting or other agreement among stockholders or any irrevocable proxy which is not otherwise illegal."

Since the original voting trust statute was first enacted in 1925, the judicial definition of a § 218 voting trust has evolved through the decisions in *Peyton v. William C. Peyton Corporation*, Del.Ch., 194 A. 106 (1937); *Aldridge v. Franco Wyoming Oil Co.*, Del.Ch., 7 A.2d 753 (1939), *aff'd* Del. Supr., 14 A.2d 380 (1940); *Abercrombie v. Davies*, Del.Supr., 130 A.2d 338 (1957), and *Lehrman v. Cohen*, Del.Supr., 222 A.2d 800 (1966). In this latter decision, at 222 A.2d 805, it is stated as follows:

"The criteria of a voting trust under our decisions have been summarized by this Court in *Abercrombie v. Davies*, 36 Del.Ch. 371, 130 A.2d 338 (1957). The tests there set forth, accepted by both sides of this cause as being applicable, are as follows: (1) the voting rights of the stock are separated from the other attributes of ownership; (2) the voting rights granted are intended to be irrevocable for a definite period of time; and (3) *the principal purpose of the grant of voting rights is to acquire voting control of the corporation*." (Emphasis added.)

It is this statement of the elements of a § 218 voting trust which the defendants seize upon in arguing that the voting trust agreement of February 10, 1976, does not fall within the statute. Specifically they argue that the third element, namely, the acquisition of control, is lacking here. Their rationale is simple. The purpose of the voting trust entered into by the plaintiffs here was not to acquire control of Oceanic. It was just the opposite. Plaintiffs had control. The sole purpose of the agreement was to cause them to relinquish the control of the corporation which they already possessed. It was this very surrender of control by the Grynberg interests which, according to the defendants, was being insisted upon by others if the corporation was to have a chance to survive.

They point to the statements in *Abercrombie v. Davies*, at 130 A.2d 345, to the effect that one purpose of the statute— with particular emphasis on that portion which requires that a copy of any voting trust be filed with the Delaware office of the corporation so as to be open to inspection by any stockholder—is to prevent the creation of secret voting trusts among minority shareholders which would prevent other shareholders from knowing where voting control of the corporation might lay. They say that such purpose is not served here since the corporate records previously revealed that the Grynberg interests were in control of the corporation through their combined 76 per cent ownership and that by virtue of the February 10, 1976, agreement the plaintiffs did no more than to vest in others of their choosing the right to vote this combined controlling interest which all other Oceanic stockholders were on notice that plaintiffs already possessed. Accordingly, since the agreement here was not of the type contemplated by the statute, and since it did not bring about a result against which the statute was designed to protect, the defendants reason that the agreement here, although admittedly a voting trust wherein the voting rights of the plaintiffs' stock are separated from the other attributes of ownership for a definite period of time, is nonetheless an agreement that is not controlled by § 218. Rather, presumably, they would label it as an otherwise permissible agreement between stockholders under § 218(e), and as a consequence they take the position that it is not governed by the mandatory requirements as to extension, deposit and transfer of certificates, and rights as to revocation as would apply to a voting trust created within the contemplation of § 218(a).

The problem I have with this, however, is that the statement from *Lehrman v. Cohen* which is relied upon by the defendants attributes its substance to *Abercrombie v. Davies, supra,* and the language in the latter decision did not expressly confine the purpose element to the "acquisition" of control as defendants would have it. Rather, the statement found at 130 A.2d 344 is as follows: ·

> "To all these elements should be added that of the principal object of such a trust, which is voting control."

See also the statement in *Aldridge v. Franco Wyoming Oil Co., supra,* at 7 A.2d 764 to the effect that the purpose of a voting trust under the statute is "to secure a certain line of corporate action." If the policy of § 218(a) is to prevent the creation of the secret agreements whereby shareholders combine to give persons other than those owning financial interests in corporate stock sufficient voting power to control the corporation, why should the policy be limited to situations where stockholders enter into such agreements so as to gain control which otherwise they would not have as opposed to situations wherein those already possessed of control, for whatever the reason, have elected to place it in the hands of others for a specified period of time? Carried to its logical extreme, the argument of the defendants would mean that other stockholders would have no right to know of an agreement whereby those with controlling interests in the corporation had surrendered that right to others by means of a voting trust. They would only have a right to know about voting trust combinations which worked an acquisition of control among shareholders who otherwise would not have had it. I perceive no rational basis for such a distinction.

Defendants, however, seek support for their position from the unreported decision of former Chancellor (now Justice) Quillen in *Fixman v. Diversified Industries, Inc.,* C.A. 4721 (May 5, 1975). In that case the plaintiff Fixman sought a declaration that a trust agreement entered into by him was invalid as a voting trust because of its failure to comply with the mandatory provisions of § 218. The Chancellor denied this relief and held that the trust provisions were enforceable against him.

Fixman had been the founder and guiding force behind Diversified. He was also its largest shareholder, owning 15 per cent of the outstanding stock. Diversified fell upon hard times and in the process became a possible take-over target for a corporate entity which was opposed by Diversified's management. Fixman had grown dissatisfied and was making overtures about selling his stock. The overall agreement arising out of this situation required Fixman to give voting control of his shares to a committee of three trustees. He was named as one trustee. Another trustee was specifically designated, and together they were to select the third trustee. The third trustee, however, was never named. Other portions of the arrangement authorized the trustees to sell the shares to persons agreed upon by them, excluding the company suspected of seeking acquisition of Diversified. Fixman was also granted additional employment benefits and was guaranteed representation on Diversified's board of directors.

The Chancellor denied relief to Fixman on the grounds that the agreement did not amount to a § 218 voting trust and that consequently it was not defective for its failure to comply with the provisions of § 218. This is the identical position advocated by the defendants here. In so holding, the Chancellor made the following statement:

> "The introductory language of § 218, that is, 'One or more stockholders may by agreement . . . ,' would appear at first glance to encompass the instance of a single, solitary settlor creating a § 218 voting trust for the purpose of voting his stock. This is not, however, generally the case and I am somewhat hardput to think of an example where it will ever be the case since 'the principle purpose' of a voting trust is 'to acquire voting control of the corporation.'" (Citing *Lehrman v. Cohen, supra.*)

The Chancellor then went on to note approvingly the rationale of decisions from other jurisdictions which concluded that the evil sought to be regulated by voting trust statutes was the secret "combination" of stockholders formed to gain control of corporate affairs, an evil which could not exist where a single shareholder already possessing control elected, for his own reasons having to do with the management of his personal property, to place his shares in a trust so as to be voted by others. He found this to be wholly consistent with the public policy announced in *Lehrman v. Cohen* where it was stated as follows at 222 A.2d 807:

> " . . . the main purpose of a Voting Trust Statute [is] to avoid secret, uncontrolled combinations of stockholders formed to acquire voting control of the corporation to the possible detriment of non-participating shareholders."

So here, the defendants argue that since the voting trust arrangement was not designed to acquire control and since in effect it constituted a voting trust established by a single shareholder, namely, Jack Grynberg in view of the fact that he controlled all plaintiffs' shares, then the situation is on all fours with and is controlled by the *Fixman* rationale, and accordingly, what the plaintiffs have done here, as in *Fixman*, is to create a valid voting trust which exists outside of and thus free from the requirements of § 218. For posterity, they suggest that a voting trust of this type might fittingly be referred to as a "Fixman Trust."

Regrettably, however, I cannot accept the *Fixman* decision as creating such a hybrid voting trust. I am forced to this conclusion for several reasons. For one thing, for better or worse, the statute does expressly permit a § 218 voting trust to be created by one shareholder. For another, in *H. M. Byllesby & Co. v. Doriot*, Del.Ch., 12 A.2d 603 (1940) a voting trust under the statute created by a single, controlling shareholder was recognized as being completely valid inasmuch as the decision dealt only with the legal right of the sole settlor to revoke and terminate the voting trust over the objec-

tions of the voting trustees. It seems noteworthy that this decision was not mentioned in *Fixman*. Thirdly, and as a practical matter, Fixman never surrendered his right to control the vote of his shares since, with only two trustees having been named, and he being one of them, the shares could not have been voted without his approval. Since a divorce of voting power from the other beneficial interests of stock ownership is the primary element of a voting trust, it could be argued that in *Fixman* the Court was not only not dealing with a § 218 voting trust but it was not dealing with a voting trust at all in the accepted sense of the term.

■ Finally, I have difficulty in conceiving that a true voting trust, where the shares are transferred to the trustees for the sole purpose of voting, can exist outside the statute. In *Perry v. Missouri-Kansas Pipe Line Co.*, Del.Ch., 191 A. 823 (1937) it was observed that there were no Delaware cases which declared voting trusts to be valid prior to the enactment of the statute. Thus, presumably, there are no Delaware decisions recognizing a common law voting trust. For this reason it was stated in *Perry* that the statute which permits voting trusts "lays down for them the law of their life." 191 A. 827. Accordingly, to have a valid voting trust, compliance with the statutory provisions is mandatory. See also, *Smith v. Biggs Boiler Works Co.*, Del.Ch., 82 A.2d 372 (1951); *In re Chilson*, Del.Ch., 168 A. 82 (1933). "Voting trusts not so complying are illegal." *Abercrombie v. Davies, supra*, at 130 A.2d 344. In its effect § 218 is exclusive and preempts the field. It "both defines the public policy of the State, with respect to voting trust agreements, and the limitations on that policy." *Appon v. Belle Isle Corporation*, Del.Ch., 46 A.2d 749, 758 (1946), *aff'd*, *Belle Isle Corporation v. Corcoran*, Del.Supr., 49 A.2d 1 (1946).

In view of this, I do not feel that this Court can be said to have sired a "Fixman Trust," or a voting trust which can live outside the statute simply because its purpose was to relinquish voting control for a

specified time as opposed to acquiring control in the first instance. Accordingly, I conclude that § 218 does govern the voting trust agreements entered into by the plaintiffs here.

## II.

■ I turn then to plaintiffs' first argument, namely, that the June 2 agreement is void in that it constitutes an attempt to extend the term of the voting trust in violation of § 218(b). On this point, I conclude that the plaintiffs are correct.

As may be recalled from the language of the statute previously set forth, § 218(b) requires that any extension of a voting trust agreement as originally fixed must occur "within two years prior" to the expiration of the original term. Here, the outside limitation on the February 10, 1976 agreement was a period of four years, thus ending on February 9, 1980. Consequently, any extension agreement would have required execution during the two-year period immediately prior to February 9, 1980. The amendatory agreement here, and the attempted extension contained therein, was executed by the plaintiffs and Oceanic on June 2, 1976. The telegrams from Burke and Goldberg were sent a few days thereafter. Thus the extension agreement was not entered into within two years prior to the expiration of the original term.

This precise point was decided in *Appon v. Belle Isle Corporation, supra,* and the decision was affirmed on appeal. It was held that this provision of the statute is mandatory, and that a purported extension agreement not executed within the prescribed statutory period (then one year) was void and of no effect. This same ruling would seem to apply here.

The defendants argue, however, that such a result does not necessarily follow in this case since the February 10 agreement contained an earlier, contingent termination date, namely, at such time as "the Prinos Oil Field located offshore Greece go on production for a period of fifteen (15) continuous days." They argue that on June 2, 1976 it was within the realm of possibility that

this event would occur within the two-year period immediately following (parenthetically I note that it did not) and if so there would have been no violation of the statute. They suggest that so long as the parties, in good faith, believed that this was a possibility at the time then the purpose for which the time limitation exists would have been satisfied. But this argument seems to be without merit.

In *Appon v. Belle Isle Corporation, supra,* at 46 A.2d 759, then Vice Chancellor Seitz reasoned the purpose of the extension limitation to be as follows:

"The provision of Section 18 requiring, in effect, that an agreement of extension, if any, must be signed within one year [now two years] prior to the expiration date of the agreement sought to be extended cannot be cast aside as unimportant. While any number of reasons may have prompted the Legislature to incorporate this provision into the law, it seems to me that one reason was to make certain the period of the voting trust could not be extended until near the end of the trust itself, at which time it could be intelligently determined by the stockholders whether the purposes for which it was created had been defeated, altered or accomplished."

Presumably, the purpose of this voting trust was, originally, to place control of the corporation in the voting trustees for a period of four years in an effort to extricate the corporation from its financial difficulties, to get it in the black so to speak, but with the understanding that if the Prinos Field went into production at any time during that four-year period the financial woes would be over anyway and the need for further control by the voting trustees would be obviated. But if this were so, what would be the sense in using the contingent curative event that would terminate the trust as the yardstick for attempting to continue the trust for a longer period beyond that event? One answer, of course, lies in the fact that the amendment, which extended the duration of the trust from four years to five, also eliminated the contingent, terminating event.

Thus, defendants' argument is that since the contingent event might have occurred and terminated the trust within two years of June 1976, it thereby provided a basis, in compliance with the statute, to amend the trust so as to both extend the original stated term and to remove the contingent terminating event. If the legislative purpose was to permit extensions only after the depositing stockholders had been afforded a fair opportunity to intelligently evaluate the success of the original voting trust, then I do not believe that this is the type of stability that it had in mind.

Another obvious drawback to allowing contingencies to fix the two-year period mandated by § 218(b) is that there could be no assurance that the extension was valid or invalid until the contingency either occurred after the fact within the two-year period or the two-year period expired without its occurrence. There could be no certainty at the time of the extension that it was being made "near the end of the trust itself." To accept defendants' argument on this point would be to subsidize drafting gamesmanship never contemplated by the statute. Accordingly, I conclude that the June 2 agreement is invalid in that it was executed in violation of § 218(b).

### III.

■ While this might be dispositive of the present motions, I think it appropriate to also comment on the other two arguments made by the plaintiffs. As to this position that the June 2 agreement is invalid because it attempts to create a voting trust with pledged stock, I think that it is also a correct one.

On its face, the June 2 agreement recites that the voting trust created by the February 10 agreement is being amended so as to give the voting trustees the power to vote 5,222,558 shares of Oceanic stock owned of record by the plaintiffs. The same document reveals that of this number of shares 4,444,381 of them are pledged to creditors, and thus are held by the creditors as security for obligations owed by Oceanic. The June 2 agreement expressly provides that upon the satisfaction of these obligations, the plaintiffs will take such steps as may be necessary to have the creditors deliver the pledged shares to the corporation so that they may be deposited in the voting trust at that time.

Thus does the June 2 agreement reveal that as of the time of its execution the vast majority of the covered shares were incapable of being deposited or transferred to the persons designated as voting trustees as required by the statute. Thus does it also reveal that immediately after the execution and filing of the agreement it was impossible for "certificates of stock [to] be issued to the voting . . . trustees to represent any stock of an original issue so deposited with . . . them" as required by 218(a). Likewise, it indicated that at the time of the June 2 agreement it was impossible that "certificates of stock so transferred to the voting . . . trustees . . . be surrendered and cancelled and new certificates therefor . . . be issued to the voting . . . trustees." Moreover, since the agreement provided that this could only take place at such time as the shares were freed from the several pledges by virtue of payment by the corporation to its named loan creditors, then the agreement indicated that there was no assurance that this would actually occur during the stated duration of the voting trust. What is the effect of this?

In *Smith v. Biggs Boiler Works Co., supra,* the agreement purporting to create a voting trust under the statute recited that the stock to be placed in the trust was then being held in escrow by an Ohio bank under a refunding agreement and that it was also subject to an option to purchase held by third parties. Thus the agreement itself made it clear that it was impossible at the time for the stock to be deposited with the trustees and for new certificates to be issued to them.

One of the two shareholders who were parties to the agreement thereafter brought suit to set aside corporate action taken on the basis of a vote of the shares by the voting trustees. It was the observation of

the Court that in principle there seemed nothing wrong with establishing a voting trust as to the voting rights only in pledged or escrowed stock, subject to the obvious, namely, that such voting trust would be terminated by a third party succeeding to the ownership of the stock through pledge, option, etc. The Court could see "no valid objection to [shareholders] joining together under a Voting Trust Agreement to vote it so long as the voting rights exist in them." 82 A.2d 375.

At the same time, the Court noted the various decisions which hold that as to voting trusts the statute is exclusive, that voting trusts can only exist in the manner provided by statute, and that compliance with the terms of the statute is mandatory. The Court also noted that an agreement between shareholders to vote their stock in a given way is valid and enforceable as a matter of policy. *Ringling v. Ringling Bros.-Barnum & Bailey Combined Shows*, Del.Ch., 49 A.2d 603 (1946), modified on other grounds, Del.Supr., 53 A.2d 441 (1947). Since this meant that the law recognized that a shareholder could effectively divorce himself from the right to vote his shares through means other than through a voting trust, then there existed another way to handle voting agreements as to pledge or escrowed shares. As stated at 82 A.2d 376:

> "The fair implication from the decision in the above case [Ringling] is that since the owners of shares in pledge or escrow may, in general, accomplish the same purpose contemplated by the Voting Trust Statute by other legally permissible methods, then the Legislature could not have intended that shares of stock, which could not be physically deposited with Voting Trustees as required by the provisions of [the voting trust statute], could ever become the subject of a valid Voting Trust."

For this reason, the action taken by the vote of the voting trustees was set aside.

Later, in *Smith v. Biggs Boiler Works Co.*, Del.Ch., 91 A.2d 193 (1952) the voting trust itself was declared invalid for basically the same reasons. There, however, the Court was asked to consider that an agreement calling for a later deposit of shares into the trust could be upheld as creating a voting trust *in futuro* at such time as the shares might be released from the pledge and become available for transfer and deposit into the trust. The Court found it unnecessary to consider this argument since, on the facts, the act of the trustees in purporting to vote the shares prior to the release of the stock from the pledge indicated that they did not consider the trust to be one *in futuro*.

It seems clear that the *Smith v. Biggs Boiler Works Co.* decisions are controlling here. The defendants, however, think otherwise. They point out that there has been no ruling on the precise issue of whether a voting trust may come into being *in futuro* and they suggest that once the stock has been released from the pledge and actually transferred to the trust by the shareholders as contemplated by the agreement, there is no logical reason not to hold that a voting trust has been created as of that time since it represents the clear intent of the parties. As to the 1,895,323 shares returned to plaintiffs by Central Bank of Denver, which plaintiffs thereafter refused to deposit with the trust, defendants say that so long as the agreement itself is not invalid for creating a voting trust *in futuro*, then it constitutes an enforceable agreement and the plaintiffs can be directed by this Court to deliver the remaining shares into the trust also. In short, defendants say that a failure to actually deposit the shares to the trust is not fatal to the existence of the trust despite the language of the decisions holding that the terms of the statute are mandatory. For this proposition they rely upon *In re Farm Industries, Inc.*, Del.Ch., 196 A.2d 582 (1963).

In that case it was argued that the voting trust agreement was void and of no effect because the parties had never taken the steps prescribed by § 218 to implement the trust formally. For one thing, the shareholders never went to the trouble of depositing their shares with the voting trustees.

For another, the voting trust agreement was not filed as required by the statute until after suit was instituted.

The Chancellor observed, however, that there was nothing improper about the agreement as drafted and that the plaintiff was forced to concede that had the mechanical formalities been accomplished in timely fashion he would have had no argument as to the validity of the voting trust. The Chancellor also noted that no third party interests had intervened and that deposit of the shares was still possible and could bring about compliance with the intent of the parties on entering into the agreement. He thus upheld the trust and directed that the parties deposit the shares in accordance with its terms. In so doing he reasoned that although the previous Delaware decisions had held the provisions of § 218 to be mandatory, they did not suggest "that a voting trust agreement which otherwise contemplates full compliance with the terms of the statute may not be specifically enforced at the instance of a party thereto." 196 A.2d 593.

The Chancellor distinguished the prior decisions as follows. In *Perry v. Missouri-Kansas Pipe Line Co., supra*, the agreement itself was illegal because it purported to be for a longer duration than permitted by the statute. In *Abercrombie v. Davies, supra*, the agreement was again illegal for failure to comply with the statute and consequently there was no agreement to enforce on remand. In *Appon v. Belle Isle Corporation, supra*, the purported extension of the trust was illegal since it was not made within one year of the expiration of the original agreement. In *In re Chilson, supra*, the agreement itself was invalid because it provided for a return of the original certificates to the shareholders with a legend thereon, rather than to provide for an issue of new certificates to the voting trustees as required by the statute. And in *Smith v. Biggs Boiler Works Co., supra*, the agreement was not subject to specific enforcement because the parties had contemplated a present trust, but did so with stock then held by third parties under terms by which it might never be available for delivery to the trustees.

But rather than support the position of the defendants, I feel that *In re Farm Industries, Inc.* actually strengthens the argument of the plaintiffs. The distinction made in that case seems to be that where a voting trust agreement itself fully complies with the statute by containing provisions which comport with the requirements of the statute, and where its deficiency lies only in the failure of the parties to formally effectuate all of such provisions, it may be upheld and enforced between them provided there has been no change of position by the parties and provided further that no third party rights have become involved in the meantime. But where, by its terms, such an agreement could not be enforced in a manner that would comply with the mandatory provisions of the statute, then it is invalid and any purported voting trust created thereunder must be set aside.

Applying this to the terms of the June 2 agreement here, it requires the voting trust attempted thereunder to be declared invalid. Quite simply, the terms of the agreement, as written, were not susceptible of enforcement at the time the agreement was made because 4,444,381 shares of the 5,222,558 called for were incapable of deposit in the trust due to the fact that they were in the legal control and possession of persons not parties to the trust agreement. Moreover, under the terms of the agreement, they might never have become available for transfer to the trust during its stated term since the availability of the pledged shares was contingent on the ability of Oceanic to pay off the designated creditors. Since the agreement itself revealed that the shares were not available for deposit as required by the statute, and possibly might never become available, then it is difficult to hold that the terms of the agreement complied with the mandatory provisions of the statute which require that the original shares be surrendered and new certificates issued to the voting trustees. It is the same situation as in *Smith v. Biggs Boiler Works Co.* It is not a situation where there has been a mere failure to carry out the terms of an otherwise proper agreement.

Nor do I feel that under these circumstances the defect can be cured and life breathed into the trust because the shares have since become available prior to the expiration of the term. This is so because there is nothing contained in the agreement that would indicate precisely when the so-called voting trust *in futuro* would come about. Since the main purpose of the statute is to permit other shareholders to know at all times where voting control of the corporation may lay, *Lehrman v. Cohen, supra,* how can this policy be served by filing an agreement which would contemplate a voting trust, and thus a new concentration of corporate control or a change of control, at a future date, but which date could not be ascertained except through extraneous information not contained in the document and thus not on file? To state the question seems to provide the answer.

Accordingly, I conclude that for this reason also the June 2 agreement failed to create a valid voting trust of the shares described therein.

## IV.

Finally, in view of the complexity of the problem and the length of time that it has taken the case to get this far, I feel it appropriate to comment briefly on the plaintiffs' argument that by their letter of October 15, 1976 they effectively revoked any voting trust that may have been created under either or both of the agreements.

For this proposition plaintiffs rely on *H. M. Byllesby & Co. v. Doriot, supra,* wherein the sole settlor of a voting trust was held to have the power to revoke and terminate the trust prior to the end of the stated term even though by the language of the trust instrument the voting trust was said to be irrevocable. Plaintiffs take the statement in that case that, generally speaking, a voting trust is a trust in the accepted equitable sense and that it is subject to the principles which regulate the administration of trusts, and couple it with the general rule that *where the* settlor of a trust is also the sole beneficiary and is not under an incapacity, he may compel the termination of the trust which he created. *Weymouth v. Delaware Trust Co.,* Del.Ch., 45 A.2d 427 (1946).

Defendants oppose this on the theory that Oceanic is also a beneficiary of the voting trust since the whole purpose for the transfer of control was to remove the corporate enterprise from the immediate clutches of its creditors, and that since Oceanic did not join in the revocation, none can be said to have taken place. Moreover, they say that since the June 2 agreement also granted Oceanic an option to purchase plaintiffs' shares which was made to coincide with the duration of the voting trust, then it is clear that plaintiffs manifested an intention that Oceanic have a beneficial interest in the continued existence of the trust. Defendants also contend that plaintiffs were estopped from revoking the trust since Oceanic, in reliance thereon, paid off over $9,000,000 in corporate obligations so as to free pledged stock of the plaintiffs for deposit into the trust, and did so with plaintiffs' knowledge prior to the letter of revocation.

It would seem settled, however, that Oceanic is not a beneficiary of any voting trust created. In *Foye v. New York University,* Del.Supr., 269 A.2d 63 (1970) it was held that the word "beneficiaries" as used in § 218(b) in connection with the extension of voting trusts refers to the shareholder creators of the trust. As stated at 269 A.2d 68–69:

"A 'beneficiary' of a property trust, generally speaking, is one interested in economic benefits flowing from the property. A 'beneficiary' of a voting trust, on the other hand, is the stockholder concerned with, and relieved of, the vote and control of the corporation for purposes that seemed good and sufficient to him when he entered into the voting trust agreement. Otherwise stated, voting trusts and § 218 are concerned with restraints on control of the corporation and not with economic interests therein.

\* \* \* \* · \* \*

"Accordingly, we hold that the stockholder-creators of a voting trust are the 'beneficiaries' empowered by § 218(b) to extend the trust."

Since this definition of "beneficiaries" stems from the nature of the voting trust as contrasted with that of the usual economic trust, I can only assume that the depositing shareholders would also be the only beneficiaries of a voting trust for all other purposes connected therewith, including acts of revocation. An incidental benefit flowing from the performance of a trust does not make a person a beneficiary. *H. M. Byllesby & Co. v. Doriot, supra.*

At the same time, under the acknowledged facts of record in this case, I am not prepared to concede that the plaintiffs' act of writing a letter of revocation operated to terminate the trust as a matter of law. And this is what their summary judgment motion asks the Court to declare. This is so because of language contained in the *Byllesby* case.

It is true that it was held there that the sole settlor, and thus the sole beneficiary of the voting trust, had the power to revoke and terminate it. It was also held there that in the absence of some representation by the sole settlor and beneficiary, it is unimportant that others might have thought that the trust would not be revoked since reliance by others upon an erroneous conclusion of law cannot defeat the settlor's power to terminate. However, although there were no such facts in that case, it was further indicated that the power of a sole settlor and beneficiary of a voting trust to revoke it might not be absolute if to do so would be inequitably by reason of representations actually made by the settlor, and relied upon by others, that the trust would remain in effect.

■ In view of the fact that the voting trust concept here came about as a result of negotiations between plaintiffs, Oceanic's management, and creditors of Oceanic, as opposed to the sole settlor's unilateral act of creating the voting trust for unrelated purposes of its own, as was the case in *Byllesby*, it is my feeling that it would be improper to hold that the plaintiffs were entitled to revoke as a matter of law in the absence of a clear factual record that would negate the existence of any representations on their part as to the duration of the trust upon which others may have relied to their detriment.

Accordingly, to the extent that plaintiffs seek summary judgment on the theory that they have revoked any voting trust created by them as a matter of law, the motion will be denied.

### V.

In view of the foregoing results reached on the plaintiffs' motion for summary judgment, I find it unnecessary to consider the cross motion of the defendants for summary judgment, based as it is on the theory that the undisputed, material facts of record show that there was no fraud or misrepresentation employed to induce the plaintiffs to enter into the voting trust agreements in the first place. At least at this point, it seems unnecessary to consider it.

I ask the parties to agree upon and submit a form of order, if possible. If this is not possible, then I ask each side to submit a form of order which, in the opinion of counsel, properly reflects the decisions made herein. In this connection, it should be noted that the plaintiffs have made no contention that the option granted and contained in the June 2 agreement is either invalid or that it has been terminated by them. Nor have I made any such ruling. In other words, insofar as any argument made at this stage of proceedings is concerned, the option remains in full force and effect.