**OCEANIC EXPLORATION COMPANY,**
Defendant Below, Appellant,

v.

**Jack J. GRYNBERG, Celeste C. Grynberg,
Celeste C. Grynberg, as sole trustee, Cel-
este C. Grynberg and Dean Smernoff, as
co-trustees, and Oceanic Holding Com-
pany, Plaintiffs Below, Appellees.**

Supreme Court of Delaware.

Submitted Oct. 21, 1980.

Decided Feb. 26, 1981.

Edward B. Maxwell, II, of Young, Conaway, Stargatt & Taylor, Wilmington, and Steven M. Umin (argued) and David D. Aufhauser, of Williams & Connolly, Washington, D. C., for defendant-appellant.

David A. Drexler and Lawrence A. Hamermesh of Morris, Nichols, Arsht & Tunnell, Wilmington, and David J. Freeman (argued), Myer Feldman and Alan S. Weitz, of Ginsburg, Feldman, Weil & Bress, Washington, D. C., for plaintiffs-appellees.

Before DUFFY, McNEILLY, QUILLEN and HORSEY, JJ., constituting the Court en banc.

QUILLEN, Justice:

This appeal comes before this Court on a challenge to an interlocutory order. Notwithstanding the stage of the proceedings, however, the case already has a lengthy legal history in the Court of Chancery and has been the subject of two lengthy opinions by the Vice Chancellor. *Grynberg v. Burke*, Del.Ch., 378 A.2d 139 (1977); *Grynberg v. Burke*, Del.Ch., 410 A.2d 169 (1979). We rely heavily on the opinions below for the statement of the facts and the statement of the issues before us.

Plaintiffs, individually and as trustees, are the owners of 76 per cent of the outstanding stock of the defendant Oceanic Exploration Company (Oceanic). In particular, the beneficial ownership of the stock interest is with Jack J. Grynberg and members of his family, the majority shareholder group. On February 10, 1976, plaintiffs entered into a written agreement whereby 51 per cent of the company's stock was placed into a "voting trust agreement" which gave their voting rights in the stock to others. The "voting trust agreement" was to expire four years later on February 9, 1980.

On June 2, 1976 this "voting trust agreement" was "amended", again by written instrument, as a result of which all of plaintiffs' stock, 76 per cent of the company's stock, totaling some 5,222,558 shares, was placed in this trust. The "Amendment to Voting Trust Agreement and Purchase Op-

tion Agreement" took the form of an agreement between the depositing shareholders and the corporation. It was not signed by the voting trustees. The June 2 instrument also added to the "voting trust agreement" an option in favor of the corporation which gave it the right for a period of 5 years to purchase "all or any part" of plaintiffs' stock. The term of the trust was amended to correspond with the option period ending 5 years from June 2, 1976. The purchase price under the option was fixed at $2.87 per share (or one-half of the then current market price of the stock) for the first year, with this price increasing by 10 per cent on each anniversary date thereafter for the term of the option. The agreement further provides that during the term of the option plaintiffs may not " 'sell, hypothecate, pledge or otherwise encumber said shares of their interests therein'." 378 A.2d at 140. The "amendment" also required Grynberg to resign as a Director and Chairman of the Board and from positions with subsidiaries, to release the company from an employment contract, and to agree not to compete with the company to a substantial extent. It further recited a general plan for the internal management of the company including a proposal to enlarge the Board of Directors. The voting trustees were to possess and be entitled "to exercise all stockholders' rights of every kind." It is fair to say that the "amendment" radically changed the nature of the agreement. Indeed, in substance it was not the same agreement.

Basically this lawsuit, filed on October 26, 1976, involves plaintiffs' attempt to have the "voting trust agreement and purchase option agreement" declared void so as to regain control of the corporation. The pretrial attack thus far has had several prongs.

The plaintiffs first moved for summary judgment on the theory that the agreements were invalid because they imposed an illegal restraint on their right to alienate their stock interests. The Court below rejected this attack at the summary judgment stage. 378 A.2d at 143–44. It is not presently before us.

Some twenty-one months after the filing of the complaint, on July 11, 1978, by a second motion for partial summary judgment, plaintiffs mounted a threefold attack upon the validity of the trust. They took the position that, first, the June 2 agreement was invalid since it attempted, not within two years prior to the time of the expiration of the February agreement, to extend the duration of a voting trust in violation of 8 *Del.C.* § 218(b).[1] Second, they argued that no voting trust was validly constituted by the June 2 agreement since it called for a deposit of some shares into the trust which, at the time, were held by others as a pledge of security for debts of the corporation. Thus, the statutory re-

quirement for a deposit of the stock could not occur.[2] Third, plaintiffs took the position that even if the first two impediments could be overcome, they, comprising all the settlors, nonetheless effectively terminated any voting trust by a letter of revocation sent by them to the corporation and the defendant voting trustees under date of October 15, 1976. 410 A.2d at 171, 174.

The Vice Chancellor found the "voting trust" portion of the agreement was governed by 8 *Del.C.* § 218 and that the June 2 "extension" agreement was invalid in that it was executed in violation of extension restrictions of § 218(b). 410 A.2d at 174–79.[3] As noted, extensions under the statute

1. 8 *Del.C.* § 218(b) provides:
"(b) At any time within 2 years prior to the time of expiration of any voting trust agreement as originally fixed or as last extended as provided in this subsection, 1 or more beneficiaries of the trust under the voting trust agreement may, by written agreement and with the written consent of the voting trustee or trustees, extend the duration of the voting trust agreement for an additional period not exceeding 10 years from the expiration date of the trust as originally fixed or as last extended, as provided in this subsection. The voting trustee or trustees shall, prior to the time of expiration of any such voting trust agreement, as originally fixed or as previously extended, as the case may be, file in the registered office of the corporation in this State a copy of such extension agreement and of his or their consent thereto, and thereupon the duration of the voting trust agreement shall be extended for the period fixed in the extension agreement; but no such extension agreement shall affect the rights or obligations of persons not parties thereto."

2. *Del.C.* § 218(a) provides:
"(a) One or more stockholders may by agreement in writing deposit capital stock of an original issue with or transfer capital stock to any person or persons, or corporation or corporations authorized to act as trustee, for the purpose of vesting in such person or persons, corporation or corporations, who may be designated voting trustee, or voting trustees, the right to vote thereon for any period of time determined by such agreement, not exceeding 10 years, upon the terms and conditions stated in such agreement. The validity of a voting trust agreement, otherwise lawful, shall not be affected during a period of 10 years from the date when it was created or last extended as provided in subsection (b) by the fact that under its terms it will or may last beyond such 10 year period. The agreement may contain any

other lawful provisions not inconsistent with such purpose. After the filing of a copy of the agreement in the registered office of the corporation in this State, which copy shall be open to the inspection of any stockholder of the corporation or any beneficiary of the trust under the agreement daily during business hours, certificates of stock shall be issued to the voting trustee or trustees to represent any stock of an original issue so deposited with him or them, and any certificates of stock so transferred to the voting trustee or trustees shall be surrendered and cancelled and new certificates therefor shall be issued to the voting trustee or trustees. In the certificate so issued it shall be stated that they are issued pursuant to such agreement, and that fact shall also be stated in the stock ledger of the corporation. The voting trustee or trustees may vote the stock so issued or transferred during the period specified in the agreement. Stock standing in the name of the voting trustee or trustees may be voted either in person or by proxy, and in voting the stock, the voting trustee or trustees shall incur no responsibility as stockholder, trustee or otherwise, except for his or their own individual malfeasance. In any case where 2 or more persons are designated as voting trustees, and the right and method of voting any stock standing in their names at any meeting of the corporation are not fixed by the agreement appointing the trustees, the right to vote the stock and the manner of voting it at the meeting shall be determined by a majority of the trustees, or if they be equally divided as to the right and manner of voting the stock in any particular case, the vote of the stock in such case shall be divided equally among the trustees."

3. The Vice Chancellor relied on *Appon v. Belle Isle Corp.*, Del.Ch., 46 A.2d 749; *aff'd sub nom. Belle Isle Corp. v. Corcoran*, Del.Supr., 49 A.2d 1 (1946). The essence of the voting trust in

are only permitted within the last two years of the term of the voting trust.

The Vice Chancellor went on to hold that, since the June 2 agreement on its face showed the majority of the covered shares were pledged and thus were incapable of being deposited in the trust, the terms of the agreement violated the mandatory certificate deposit provisions of 8 *Del.C.* § 218(a). Thus, for this additional reason, the Vice Chancellor concluded the June 2 agreement failed to create a valid statutory voting trust of the shares described therein. 410 A.2d at 179–82.[4]

As to the third contention of the plaintiffs in their second motion, revocation, the Vice Chancellor, relying on *H. M. Byllesby & Co. v. Doriot*, Del.Ch., 12 A.2d 603 (1940), said "it would be improper to hold that the plaintiffs were entitled to revoke as a matter of law in the absence of a clear factual record that would negate the existence of any representations on their part as to the duration of the trust upon which others may have relied to their detriment." 410 A.2d at 183. This contention is not before us in this interlocutory appeal.

Oceanic brings this appeal arguing: (1) the June 2 agreement is not a § 218 voting trust; (2) the June 2 agreement is validated by § 218(e); and (3) the June 2 agreement must be validated by general principles of equity. The plaintiffs counter that the statutory provisions relating to voting trusts govern this case and the Trial Court should be affirmed.

Some financial background is necessary to understand the appeal. "By February 1976, Oceanic was in deep financial trouble, several large loans were overdue, and, as to one such loan, Morgan Guaranty Trust Company of New York had filed suit for recovery. It was at this point that the original voting trust concept was suggested and put into effect. Without going into the contested details at this point, it is suffi-

cient to note that with the surrender of voting control of the corporation to three outside directors by means of the voting trust, Morgan Guaranty Trust Company withdrew its lawsuit and extended the loan." 410 A.2d at 171–72.

While the Vice Chancellor found it unnecessary to go into the facts surrounding the execution of the June 2 document, it should be noted generally that the background facts and the reasons for the execution of that document are hotly contested and indeed constitute the heart of the dispute between the opposing sides, at least factually. The company says that, despite the February agreement, Grynberg remained in control and the financial situation worsened. As summarized in the appellants' brief, the company was on the brink of bankruptcy, was failing to meet its obligations, was facing a renewal of the Morgan suit, and was threatened by a minority shareholder suit. It was in this atmosphere, the company says, that Grynberg and his family, fully advised, entered the June 2 agreement relinquishing control and granting the option in exchange for valuable benefits including indemnity for large liabilities. Having reaped the benefit of the contract debt elimination and stock resurrection, the company says Grynberg now seeks to escape his legitimate burden under the contract.

Plaintiffs' view is different. They say they were given 24 hours notice to agree to changes in the February agreement on the fraudulent representations that a partner in a Greek venture was willing to purchase a certain interest in a Greek concession, sufficient to solve the company's financial crisis, if the amendments were made. This fraudulent inducement appears to be the major contention of the original complaint.

The Vice Chancellor, with customary precision, isolated a threshold question, namely: Is the "voting trust agreement" here governed by § 218? He concluded that it

that case was a pooling of the voting rights of five individual stockholders.

**4.** The Vice Chancellor relied on *Smith v. Biggs Boiler Works Co.*, Del.Ch., 82 A.2d 372 (1951)

and *Smith v. Biggs Boiler Works Co.*, Del.Ch., 91 A.2d 193 (1952). The essence of the voting trust in that case was a pooling of the voting rights of two individual stockholders.

was and, in so doing, as a matter of law, voided the trust for the reasons noted above, thereby eliminating the conflicting factual equities argued by the parties as to the voting trust. He did not disturb at this stage the option in the June 2 agreement. We are unable to agree to that disposition and therefore we are compelled to reverse. But we do not do so with ease and we candidly find our position difficult to express and regretfully perhaps less clear than the view so positively expressed below. Stated as directly and simply as possible, there are prominent facts which weigh against our conclusion. The February and June agreements were expressly labeled "VOTING TRUST AGREEMENT" and "AMENDMENT TO VOTING TRUST AGREEMENT AND PURCHASE OPTION AGREEMENT" and both were filed in the registered office of the corporation in Delaware as required by § 218(a). The description used and action taken by the parties thus brings the role of statute directly into play.

While the statute, § 218(a) and (b) does not expressly state it is exclusive, the case law rather pointedly supports the view that § 218 of the Delaware General Corporation Law provides the exclusive method for creating voting trusts of stock of a Delaware corporation. See *Abercrombie v. Davies*, Del.Supr., 130 A.2d 338 (1957); *Smith v. Biggs Boiler Works Co.*, Del.Ch., 82 A.2d 372 (1951); *Appon v. Belle Isle Corp.*, Del. Ch., 46 A.2d 749, 756 (1946), *aff'd sub nom. Belle Isle Corp. v. Corcoran*, Del.Supr., 49 A.2d 1 (1946); *Ringling v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc.*, Del.Ch., 49 A.2d 603, 608 (1946), *modified*, Del.Supr., 53 A.2d 441 (1947); *Perry v. Missouri-Kansas Pipe Line Co.*, Del.Ch., 191 A. 823 (1937); *In re Chilson*, Del.Ch., 168 A. 82 (1933).

■ But our decision can neither rest blindly on the form elected by the parties to the June agreement without regard to the substance of the whole contract nor on the exclusivity of the statute without regard to its scope or intended purpose. Deciding the case on such bases would constitute an abstraction divorced from the facts of the case and the intent of the law. The term voting trust as used in our law is a concept which flows from our statute and is specifically defined by our statute and case law. See, e. g., *Abercrombie*, 130 A.2d at 344. Case comment as to statutory exclusivity has to be related to that definition. In determining the applicability of § 218(a) and (b), the test is whether the substance and purpose of the stock arrangement is "sufficiently close to the substance and the purpose of [the statute] to warrant its being subject to the restrictions and conditions imposed by that statute". *Lehrman v. Cohen*, Del. Supr., 222 A.2d 800, 806 (1966). As did the Vice Chancellor, we take a frontal tack and direct our attention to the same threshold question. Is the voting trust arrangement here governed by § 218(a) and (b)?

Without attempting to resolve factual disputes, we note the defendant alleges, with some record support, evidence of the following factors:

(1) The final overall contract is one of internal corporate reorganization with integrated portions of which the voting trust is merely one.

(2) The final contract here, including the voting trust feature, is an agreement between the majority shareholder group and the corporation.

(3) While the voting trust portion of the contract is important, it is basically an enforcement provision to a purchase option agreement involving the sale of the majority interest and incidents connected with such sale such as change in management and an agreement not to compete.

(4) The contract is open and notorious within the corporation. Not only was the contract with the corporation itself and not only did it occasion fundamental changes in corporate management but it was prominently featured and positively represented in the proxy statement dated October 14, 1976 and in the 1975 annual report. The operations of the company and the involvement of minority shareholders, officers and employees proceeded in reliance on the contract.

**6**

(5) The contract serves a valid corporate purpose, being designed to end financial hardship, and perhaps to end financial ruin.

(6) The contract has been significantly performed by the corporation, its officers and employees.

(7) A substantial benefit has been conferred on the depositing majority shareholder group.

(8) The contemplated benefit to the corporation and the minority shareholders remains largely executory.

(9) The party seeking a declaration that the agreement is void is the depositing majority shareholder group itself.

In such a factual setting, if established or substantially established at trial, we do not find that the Vice Chancellor should be legally prohibited from specifically enforcing the "voting trust agreement" in issue here as a consequence of the statutory provisions contained in § 218(a) and (b).[5] Our reasons are simple: statutory language, statutory purpose and public policy.

■ First, even viewed historically, § 218, from its original enactment in 1925, was designed to regulate agreements by "[o]ne or more stockholders". 34 *Del.Laws* Ch. 112, § 6 (1925). Not all trusts of corporate stock which, either expressly or by implication, give voting rights to a trustee are voting trusts. *Aldridge v. Franco Wyoming Oil Co.*, Del.Ch., 7 A.2d 753, 764 (1939), aff'd, Del.Supr., 14 A.2d 380 (1940). As was noted in *Fixman v. Diversified Industries, Inc.*, Del.Ch., 1 Del.J.Corp.Law 171, 178–79 (1975), the statutory language contemplates an association of stockholders whether it be created by way of individual agreements or joint agreements.[6] The Court of Chancery defined a voting trust in *Peyton v. William C. Peyton Corp.*, Del.Ch., 194 A. 106, 111 (1937), *rev'd on other grounds*, Del.Supr., 7 A.2d 737 (1939) in the following manner:

> "A voting trust as commonly understood is a device whereby two or more persons owning stock with voting powers, divorce the voting rights thereof from the ownership, retaining to all intents and purposes the latter in themselves and transferring the former to trustees in whom the voting rights of all the depositors in the trust are pooled."

This definition has been adopted in several cases. *Smith*, 91 A.2d at 197; *Ringling Bros.*, 49 A.2d at 608; *Aldridge*, 7 A.2d at 764. Regulation of voting trusts is directed

5. Obviously, on the defendant's version of the facts, the equities lie totally in the defendant's favor. We have considered several other possible legal approaches on the possibility that the defendant would prevail in the factual disputes. For example, consideration was given to recognizing the general intent of the parties to form a valid voting trust and permitting the Vice Chancellor to frame the precise mechanics; but this approach seems to run counter to both our voting trust law and our rather strict law of contract reformation. See the *Perry, Abercrombie, Appon, Chilson,* and *Smith* cases, all cited *supra* and discussed below by the Vice Chancellor, 410 A.2d at 181. See also *Collins v. Burke*, Del.Supr., 418 A.2d 999, 1002 (1980) which emphasizes the need for reformation to be in accordance with the parties' own manifestation of intention. Moreover, in the statutory voting trust area, our courts have not generally, nor specifically with relation to illegal time extensions or inability to make stock deposits, been inclined to weigh equities or characterize the illegality as merely *malum prohibitum*. See nn. 3 & 4, *supra*. Finally, equitable principles of restitution, estoppel and unclean hands are not particularly helpful in face of case law declaring non-complying voting trusts regulated by the statute to be void. While we are not here called upon to foreclose and do not foreclose consideration of any such approach, all of these indirect approaches seem to us an attempt to hide the real issue which is consequently disclosed and emphasized. Is the "voting trust agreement" in this case the type of agreement the General Assembly intended to regulate in § 218(a) and (b)? Thus, as indicated, we take the frontal approach and address that issue directly.

6. The Vice Chancellor analyzed in detail the *Fixman* decision and directed some attention to the statutory authorization for a single shareholder to create a § 218 voting trust and to the lack of distinction between acquiring voting control and surrendering voting control. 410 A.2d at 176–78. It is not necessary to disagree with the Vice Chancellor on these two points in order to satisfy the approach taken in this opinion. It should be noted, however, that in the *Byllesby* case, the agreement specifically authorized other stockholders, as well as the single depositing corporate shareholder, to participate. 12 A.2d at 604.

to a class of trusts created to unify voting. See 5 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 2075 at 333 n. 2 (rev. perm. ed. 1976). Fletcher goes on to note in § 2077 at 336 that:

"At the bottom of a voting trust is an agreement among stockholders . . . ."

Thus, the voting trust statute was not intended to be all inclusive in the sense that it was designed to apply to every set of facts in which voting rights are transferred to trustees incident to or as part of the assignment of other stockholder rights. Rather, a voting trust is a stockholder pooling arrangement with the criteria that voting rights are separated out and irrevocably assigned for a definite period of time to voting trustees for control purposes while other attributes of ownership are retained by the depositing stockholders. *Lehrman,* 222 A.2d at 805; *Peyton,* 194 A. at 111. While we do not suggest that the mere fact that the corporation is a party removes a trust from the statute, we do find that the final contract in issue here, with its multi-faceted aspects including a stock purchase option agreement running from an already unified majority shareholder group to the corporation may be so foreign to the stockholder voting trust agreement to which the language used by the General Assembly was directed that it is beyond the contemplated scope of the statute. Given the scope of this agreement it may be that the voting rights are not separated from the other retained attributes of ownership. In short, the agreement here may not be a voting trust as that term is used in our law.

■ Second, our case law makes it clear that the main purpose of a voting trust statute is "to avoid secret, uncontrolled combinations of stockholders formed to acquire control of the corporation to the possible detriment of non-participating shareholders." *Lehrman,* 222 A.2d at 807. The contract involved in this case, given the factual contentions of the defendants, may be so far divorced from that purpose that it makes the contemplated regulation unnecessary and irrelevant.

Third, it is important to recognize there has been a significant change from the days of our original 1925 statute. Voting trusts were viewed with "disfavor" or "looked upon . . . with indulgence" by the courts. See *Perry,* 191 A. at 827. Other contractual arrangements interfering with stock ownership, such as irrevocable proxies, were viewed with suspicion. The desire for flexibility in modern society has altered such restrictive thinking. E. Folk, The Delaware General Corporation Law, Section 218 at 240–42 (1972). The trend of liberalization was markedly apparent in the 1967 changes to our own § 218.[7] Voting or other agreements and irrevocable proxies were given favorable treatment and restrictive judicial interpretations as to the absolute voiding of voting trusts for terms beyond the statutory limit were changed by statute.[8] The

---

**7.** As Professor Folk's treatise points out, in the voting trust area, even prior to 1967, some cases "show a marked disposition to uphold transactions rather than strike them down for non-conformity with the voting trust statute." Folk, *supra,* Section 218 at 235, particularly n. 15 (1972). See also *id.* at 236 n. 19. Thus, the Delaware courts have on occasion avoided the harshness of the exclusivity by finding the arrangement not to be a voting trust [*Lehrman v. Cohen, supra*], by specifically enforcing statutory requirements the parties had neglected to implement [*In re Farm Industries, Inc.,* Del.Ch., 196 A.2d 582, 592–94 (1963)] and by "expressly [disaffirming] the suggested proposition that any illegality in a voting trust renders the entire agreement illegal" [*Tracey v. Franklin,* Del. Supr., 67 A.2d 56, 61 (1949)]. See also *Peyton; Aldridge; Ringling Bros.,* all cited *supra.*

**8.** 8 *Del.C.* § 218(c), (d) and (e) provide:

"(c) An agreement between 2 or more stockholders, if in writing and signed by the parties thereto, may provide that in exercising any voting rights, the shares held by them shall be voted as provided by the agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon by them. No such agreement shall be effective for a term or [sic] more than 10 years, but, at any time within 2 years prior to the time of the expiration of such agreement, the parties may extend its duration for as many additional periods, each not to exceed 10 years, as they may desire.

"(d) The validity of any such voting trust or other voting agreement, otherwise lawful, shall not be affected during a period of 10 years from the date when it was created or last extended

trend was not to extend the voting trust restrictions beyond the class of trust being regulated and beyond the reasons for statutory regulation. That public policy cannot be ignored here.

■ Thus we are faced with a "voting trust agreement" which: (1) may not fit into the situation contemplated by the language of the restrictive statute, (2) may have little, if any, connection with the purpose for which the statute was enacted, and (3) may have no evil or improper aspects under any current ascertainable public policy. Given such circumstances, we are hard pressed to see why § 218(a) and (b) should be a legal bar to a factual inquiry and a discretionary consideration by the Court of Chancery of full enforcement of the contract in this case. We conclude the Vice Chancellor erred in holding the voting trust aspect of the contract in this case to be, as a matter of law, a § 218(a) and (b) voting trust.

The interlocutory order of the Court of Chancery is reversed and the case is remanded.

by the fact that under its terms it will or may last beyond the 10 year period.

"(e) This section shall not be deemed to invalidate any voting or other agreement among stockholders or any irrevocable proxy which is not otherwise illegal."